## ASAKURA *v.* CITY OF SEATTLE ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON

No. 211.   Argued February 25, 1924.—Decided May 26, 1924.

1. The treaty-making power extends to all proper subjects of negotiation between our Government and foreign nations, including that of promoting friendly relations by establishing rules of equality between foreign subjects while here and native citizens. P. 341.

2. A rule of equality thus established stands on the same footing of supremacy as the Federal Constitution and laws, cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws, operates without the aid of legislation, state or national, and is to be applied and given authoritative effect by the courts. *Id.*

3. A treaty is to be liberally construed; when two constructions are possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. P. 342.

4. The Treaty of April 5, 1911, with Japan, provides that the citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other " to carry on trade, . . . to own or lease and occupy . . . shops, . . . to lease land for . . . commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established," and " shall

receive . . . the most constant protection . . . for their
. . . property." *Held,* that pawnbroking, which is licensed and
recognized as a business by the law of the State of Washington, is
"trade" within the meaning of the treaty, and that a city ordi-
nance in that State which undertook to confine the business to
citizens of the United States was void as applied to a Japanese
subject lawfully admitted to this country. P. 342.
122 Wash. 81, reversed.

ERROR to a decree of the Supreme Court of Washington
which sustained an ordinance of the City of Seattle re-
stricting the business of pawnbroking, in a suit brought by
Asakura to prevent its enforcement.

*Mr. Dallas V. Halverstadt,* for plaintiff in error, sub-
mitted. *Mr. E. Heister Guie* was also on the brief.

A business can not be prohibited by a state legislature
unless there is inherent in the business, irrespective of the
character of some men who may engage in it, some evil or
direct tendency to evil. *Cargill Co.* v. *Minnesota,* 180
U. S. 452; *Adams* v. *Tanner,* 244 U. S. 590. Distinguish-
ing *Phalen* v. *Virginia,* 8 How. 163; *Mugler* v. *Kansas,* 123
U. S. 623; *Crowley* v. *Christensen,* 137 U. S. 86; *Austin* v.
*Tennessee,* 179 U. S. 343; *Lottery Case,* 188 U. S. 321;
*Otis* v. *Parker,* 187 U. S. 606; *Murphy* v. *California,* 225
U. S. 623; *McCray* v. *United States,* 195 U. S. 27; *Rast* v.
*Van Deman & Lewis Co.,* 240 U. S. 342; *Tanner* v. *Little,*
240 U. S. 369; *Clark Distilling Co.* v. *Western Maryland
Ry. Co.,* 242 U. S. 311; *Wilson* v. *New,* 243 U. S. 332.

The same argument is made to sustain this ordinance as
was made to sustain Initiative No. 8, of this State, which
prohibited any employment agent from charging for se-
curing employment for anyone or for furnishing informa-
tion leading thereto; and the state court listened with
approval to the argument. *Huntworth* v. *Tanner,* 87
Wash. 670; *State* v. *Rossman,* 93 Wash. 530. But those
decisions were contrary to the Constitution of the United
States. *Adams* v. *Tanner,* 244 U. S. 590.

The right to prohibit must be found in the inherent nature or characteristic of the business at which the legislative act is directed.

The business of pawnbroker is lawful and the legislature cannot prohibit any honest man from engaging therein.

If the business is not lawful, the City cannot license it. The City, however, is asserting the power to license the business, and it thereby is foreclosed from contending that the business itself is not lawful. Furthermore, the business is recognized as lawful by the statutes of the State.

The argument which is made to sustain this ordinance incontrovertably leads to the conclusion that any dishonesty occurring in a business justifies the legislature in abolishing the business.

The City cannot decline to grant a license to the plaintiff in error merely because he is a subject of the Emperor of Japan. Though an alien he is protected by the Equal Protection Clause of the Fourteenth Amendment. Citing many decisions, including *Terrace* v. *Thompson,* 263 U. S. 197; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Truax* v. *Raich,* 239 U. S. 33.

Again, the plaintiff in error has the right to engage in business as a pawnbroker by the express terms of § 1977, Rev. Stats.  *Yick Wo* v. *Hopkins,* 118 U. S. 356; *United States* v. *Wong Kim Ark,* 169 U. S. 649; *Whitefield* v. *Hanges,* 222 Fed. 745.

Nothing said by this Court in the case of *Terrace* v. *Thompson,* 263 U. S. 197, is in conflct with the foregoing. It must be remembered that the question before the Court in that case was the right of the State to prohibit aliens from owning or leasing real estate within the limits of the State, and that general language in an opinion must be restrained to the particular facts before the Court.

The Treaty between the United States and Empire of Japan does not permit of the refusal of the City to grant the plaintiff in error the license in question.

As for the scope of the term "trade," see *Schooner Nymph,* 1 Sumn. 517; *State* v. *North,* 160 N. C. 1010; *Smith* v. *Cooley,* 65 Cal. 46; *Chase National Bank* v. *Faurot,* 149 N. Y. 532; *State* v. *Phipps,* 50 Kan. 609; *Denny* v. *Bridges,* 19 Wash. 44; *Spotswood* v. *Morris,* 12 Idaho, 360; *State* v. *Tagami,* (Super. Ct. Calif., Los Angeles County, July 9, 1923).

*Mr. Charles T. Donworth,* with whom *Mr. Thomas J. L. Kennedy, Mr. Walter B. Beals* and *Mr. Edwin C. Ewing* were on the brief, for defendants in error.

The ordinance involved must be treated as a statute of the State of Washington. *Shepard* v. *Seattle,* 59 Wash. 363; *Crowley* v. *Christensen,* 137 U. S. 86.

Every legislative act is presumed to be constitutional, and if any state of facts can be reasonably conceived to exist which would sustain the act, the Court will presume such facts to have existed.

The motives of the legislators in enacting a law will not be inquired into by the Court.

No person has a vested right to engage in pawnbroking.

Because of the facilities that it affords for aiding in and concealing the commission of crime, it has always been regarded by the law as an inherently vicious occupation which may be prohibited entirely. It is not a necessary business and engaging in it is merely a privilege. *St. Joseph* v. *Levin,* 128 Mo. 588; *Grand Rapids* v. *Braudy,* 105 Mich. 670; *Levinson* v. *Boas,* 150 Cal. 185; *Elsner Bros.* v. *Hawkins,* 113 Va. 47; *Grossman* v. *Indianapolis,* 173 Ind. 157; *St. Louis* v. *Baskowitz,* 273 Mo. 543; *Seattle* v. *Barto,* 31 Wash. 141; 20 Encyclopedia Britannica, 11th ed., p. 973.

While, so far as our investigation discloses, this Court has never had occasion to pass upon the status of pawnbroking under the police power, it has discussed the power of the State to prohibit inherently vicious and non-useful occupations. *Crowley* v. *Christensen,* 137 U. S. 86.

In that decision it was strongly intimated that the municipal authorities might pick and choose between applicants for licenses and grant licenses only when deemed proper. *Booth* v. *Illinois,* 184 U. S. 425; *Murphy* v. *California,* 225 U. S. 623; *Terrace* v. *Thompson,* 263 U. S. 197.

The ordinance involved in this case merely restricts the privilege of engaging in this unnecessary and inherently vicious occupation to citizens of the United States. Since, under the authorities cited, the city council could have prohibited the occupation entirely, it can limit its exercise to citizens of the United States without violating the Fourteenth Amendment or the guarantees contained in the Japanese Treaty.

It has been held in numerous cases, that if the business is one that may be prohibited, alienage may justify the denial of the privilege, though of course a State cannot discriminate between aliens and citizens in respect to those useful businesses which every person may follow as of right. *Truax* v. *Raich,* 239 U. S. 33; *People* v. *Crane,* 214 N. Y. 154; *Crane* v. *New York,* 239 U. S. 195; *Heim* v. *McCall,* 239 U. S. 175; *Commonwealth* v. *Hana,* 195 Mass. 262; *Trageser* v. *Gray,* 73 Md. 250; *Bloomfield* v. *State,* 86 Oh. St. 253; *Morin* v. *Nunan,* 91 N. J. L. 506; *State* v. *Ames,* 47 Wash. 328; *Ozawa* v. *United States,* 260 U. S. 178; *Yamashita* v. *Hinkle,* 260 U. S. 199. That the classification adopted by the city council in the present case does not deny the plaintiff in error equal protection of the laws, is conclusively shown by *Terrace* v. *Thompson,* 263 U. S. 197. See also *Frick* v. *Webb,* 263 U. S. 326; *Webb* v. *O'Brien,* 263 U. S. 313.

The basis of classification between aliens and citizens being a proper one, the ordinance is not invalid because Congress has so far failed to make Japanese subject to naturalization.

Furthermore, the burden of showing that the classification complained of does not rest upon any reasonable

basis, is upon the plaintiff in error. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61.

The legislators had a right to presume that pawnbroking would be conducted by citizens with less harm to the public welfare than when conducted by aliens. In any event, this Court cannot substitute its judgment upon this question for that of the legislative body. *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245.

The Federal Government through the treaty-making power cannot restrict the police power of a sovereign State. *Missouri* v. *Holland,* 252 U. S. 416, discussed.

So far as our investigations disclose, the only opinion of this Court which squarely passes upon the relation between the treaty-making power of the Federal Government and the police power of the States, is that of Mr. Justice Daniel, in the *License Cases,* 5 How. 504. Chief Justice Taney, in his dissenting opinion in the *Passenger Cases,* 7 How. 283, expressed a similar view, and Mr. Justice Daniel in that case approvingly quoted from his former opinion. Although these were minority opinions, those of the majority do not seem to disagree with them upon this point.

Another expression of this Court to the effect that the treaty-making power is limited by the other provisions of the Constitution and by the peculiar nature of our form of government, is found in *Geofroy* v. *Riggs,* 133 U. S. 258.

Mr. Justice White rendered a special concurring opinion in *Downes* v. *Bidwell,* 182 U. S. 244, concurred in by Justices Shiras and McKenna, pointing out that the treaty-making power must be interpreted with reference to the nature of our government and in harmony with related provisions of the Constitution. See *Compagnie Francaise* v. *Board of Health,* 51 La. Ann. 645; s. c. 186 U. S. 380, 394; *In re Wong Yung Quy,* 2 Fed. 624; *Cantini* v. *Till-*

*man,* 54 Fed. 969; *People* v. *Naglee,* 1 Cal. 232; *Siemssen* v. *Bofer,* 6 Cal. 250; *Pierce* v. *State,* 13 N. H. 536.

If Congress and the President cannot enact a statute which violates the Tenth Amendment, how can the President and the Senate, together with some alien minister or other diplomatic representative, enter into a treaty which has that effect? The decision in *Missouri* v. *Holland, supra,* intimates that such is the case, but even if the broad statement referred to be correct, the facts of that case are distinguishable from the present case in that the subject-matter was not local and internal.

As was said in *Kansas* v. *Colorado,* 206 U. S. 46, 90: " The powers affecting the internal affairs of the States not granted to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, and all powers of a national character which are not delegated to the National Government by the Constitution are reserved to the people of the United States. . . . This Article X is not to be shorn of its meaning by any narrow or technical construction, but is to be considered fairly and liberally so as to give effect to its scope and meaning."

One of the powers reserved to the State (which is to be liberally construed), is the police power, pursuant to which a State may prohibit callings dangerous to the public.

If the treaty-making power should be declared to be not limited by the other provisions of the Constitution, then it becomes a convenient substitute for legislation in fields over which Congress has no jurisdiction. As this Court knows, a treaty is usually drafted secretly by the State Department or commissioners appointed by the President, in conference with some foreign representative.

This Court has always restrained attempts on the part of either the Federal Government or the States to encroach upon or impair the powers of the other. *Slaughter-*

*House Cases,* 16 Wall. 36; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Child Labor Tax Case,* 259 U. S. 20.

The Japanese Treaty does not guarantee the privilege of engaging in pawnbroking.

The term " trade " as used in the treaty, means dealing in commodities as a buyer or seller, but can not reasonably be held to include the indiscriminate loaning of money upon pledge of personal effects. *May* v. *Sloan,* 101 U. S. 231; *State* v. *Krech,* 10 Wash. 166; Bouvier, Law Dict., 8th ed.; Webster's Int. Dict.; 27 Encyclopedia Britannica, 11th ed., p. 127; *Terrace* v. *Thompson,* 263 U. S. 197; *Frick* v. *Webb,* 263 U. S. 326; *Webb* v. *O'Brien,* 263 U. S. 313.

While treaties must be construed liberally to make effective the intention of the parties, yet a strained construction such as suggested by plaintiff in error should not be indulged in. We agree that the word " trade " is used in the ordinary acceptation of the term, but where was the word " trade " ever used to describe the act of pawning, or the term " tradesman " to designate a pawnbroker?

It has already been demonstrated that pawnbroking is a privilege. This being so, the provisions of the treaty are inapplicable. *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Heim* v. *McCall,* 239 U. S. 175; *Bondi* v. *Mackay,* 87 Vt. 271.

Mr. Justice Butler delivered the opinion of the Court.

Plaintiff in error is a subject of the Emperor of Japan, and, since 1904, has resided in Seattle, Washington. Since July, 1915, he has been engaged in business there as a pawnbroker. The city passed an ordinance, which took effect July 2, 1921, regulating the business of pawnbroker and repealing former ordinances on the same subject. It makes it unlawful for any person to engage in the business unless he shall have a license, and the ordinance provides

" that no such license shall be granted unless the applicant be a citizen of the United States." Violations of the ordinance are punishable by fine or imprisonment or both. Plaintiff in error brought this suit in the Superior Court of King County, Washington, against the city, its Comptroller and its Chief of Police to restrain them from enforcing the ordinance against him. He attacked the ordinance on the ground that it violates the treaty between the United States and the Empire of Japan, proclaimed April 5, 1911, 37 Stat. 1504; violates the constitution of the State of Washington, and also the due process and equal protection clauses of the Fourteenth Amendment of the Constitution of the United States. He declared his willingness to comply with any valid ordinance relating to the business of pawnbroker. It was shown that he had about $5,000 invested in his business, which would be broken up and destroyed by the enforcement of the ordinance. The Superior Court granted the relief prayed. On appeal, the Supreme Court of the State held the ordinance valid and reversed the decree. The case is here on writ of error under § 237 of the Judicial Code.

Does the ordinance violate the treaty? Plaintiff in error invokes and relies upon the following provisions: " The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established. . . . The citizens or subjects of each . . . shall receive, in the territories of the other, the most constant protection and security for their persons and property, . . . ."

A treaty made under the authority of the United States "shall be the supreme law of the land; and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding." Constitution, Art. VI, § 2.

The treaty-making power of the United States is not limited by any express provision of the Constitution, and, though it does not extend " so far as to authorize what the Constitution forbids," it does extend to all proper subjects of negotiation between our government and other nations. *Geofroy* v. *Riggs,* 133 U. S. 258, 266, 267; *In re Ross,* 140 U. S. 453, 463; *Missouri* v. *Holland,* 252 U. S. 416.   The treaty was made to strengthen friendly relations between the two nations.   As to the things covered by it, the provision quoted establishes the rule of equality between Japanese subjects while in this country and native citizens. Treaties for the protection of citizens of one country residing in the territory of another are numerous,[1] and make for good understanding between nations.   The treaty is binding within the State of Washington.   *Baldwin* v. *Franks,* 120 U. S. 678, 682–683.   The rule of equality established by it cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws.   It stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States.   It operates of itself without the aid of any legislation, state or national; and it will be applied and given authoritative effect by the courts.   *Foster* v. *Neilson,* 2 Pet. 253, 314; *Head Money Cases,* 112 U. S. 580, 598; *Chew Heong* v. *United States,* 112 U. S. 536, 540; *Whitney* v. *Robertson,* 124 U. S. 190, 194; *Maiorano* v. *Baltimore & Ohio R. R. Co.,* 213 U. S. 268, 272.

The purpose of the ordinance complained of is to regulate, not to prohibit, the business of pawnbroker.   But it

---

[1] See " Handbook of Commercial Treaties," prepared by United States Tariff Commission, 1922.

makes it impossible for aliens to carry on the business. It need not be considered whether the State, if it sees fit, may forbid and destroy the business generally. Such a law would apply equally to aliens and citizens, and · no question of conflict with the treaty would arise. The grievance here alleged is that plaintiff in error, in violation of the treaty, is denied equal opportunity.

It remains to be considered whether the business of pawnbroker is " trade " within the meaning of the treaty. Treaties are to be construed in a broad and liberal spirit, and, when two constructions are possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. *Hauenstein* v. *Lynham,* 100 U. S. 483, 487; *Geofroy* v. *Riggs, supra,* 271; *Tucker* v. *Alexandroff,* 183 U. S. 424, 437. The ordinance defines " pawnbroker " to " mean and include every person whose business or occupation [it] is to take and receive by way of pledge, pawn or exchange, goods, wares or merchandise, or any kind of personal property whatever, for the repayment or security of any money loaned thereon, or to loan money on deposit of personal property "; and defines " pawnshop " to " mean and include every place at which the business of pawnbroker is carried on." The language of the treaty is comprehensive. The phrase " to carry on trade " is broad. That it is not to be given a restricted meaning is plain. The clauses " to own or lease . . . shops, . . . to lease land for . . . commercial purposes, and generally · to do anything incident to or necessary for trade," and " shall receive . . . the most constant protection and security for their . . . property ... ." all go to show the intention of the parties that the citizens or subjects of either shall have liberty in the territory of the other to engage in all kinds and classes of business that are or reasonably may be embraced within the meaning of the word " trade " as used in the treaty.

By definition contained in the ordinance, pawnbrokers are regarded as carrying on a " business." A feature of it is the lending of money upon the pledge or pawn of personal property which, in case of default, may be sold to pay the debt. While the amounts of the loans made in that business are relatively small and the character of property pledged as security is different, the transactions are similar to loans made by banks on collateral security. The business of lending money on portable securities has been carried on for centuries. In most of the countries of Europe, the pledge system is carried on by governmental agencies; in some of them the business is also carried on by private parties. In England, as in the United States, the private pledge system prevails. In this country, the practice of pledging personal property for loans dates back to early colonial times, and pawnshops have been regulated by state laws for more than a century. We have found no state legislation abolishing or forbidding the business. Most, if not all, of the States provide for licensing pawnbrokers and authorize regulation by municipalities. While regulation has been found necessary in the public interest, the business is not on that account to be excluded from the trade and commerce referred to in the treaty. Many worthy occupations and lines of legitimate business are regulated by state and federal laws for the protection of the public against fraudulent and dishonest practices. There is nothing in the character of the business of pawnbroker which requires it to be excluded from the field covered by the above quoted provision, and it must be held that such business is " trade " within the meaning of the treaty. The ordinance violates the treaty. The question in the present case relates solely to Japanese subjects who have been admitted to this country. We do not pass upon the right of admission or the construction of the treaty in this respect, as that question is not before us and would require consideration of

other matters with which it is not now necessary to deal. We need not consider other grounds upon which the ordinance is attacked.

*Decree reversed.*