**SHIZUKO KUMANOMIDO v. NAGLE, Immigration Com'r.**

**No. 5945.**

Circuit Court of Appeals, Ninth Circuit.

April 7, 1930.

Albert H. Elliot, Guy C. Calden, and Russell W. Cantrell, all of San Francisco, Cal. (Raymond L. Frick, of San Francisco, Cal., of counsel), for appellant.

George J. Hatfield, U. S. Atty., and William A. O'Brien, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before DIETRICH and WILBUR, Circuit Judges, and KERRIGAN, District Judge.

WILBUR, Circuit Judge.

This is an appeal from the order and judgment of the District Court denying a petition for writ of habeas corpus filed herein by petitioner, now appellant. Appellant's husband, Yoshiko Kumanomido, a subject of the Empire of Japan, is engaged as the editor of a Japanese daily newspaper published in San Francisco and now resides in San Francisco. After having resided in the United States for more than five years, Yoshiko Kumanomido departed for Japan on April 2, 1928. While in Japan, and on October 11, 1928, he married the appellant herein, who is also a subject of Japan. On December 7, 1928, petitioner arrived in the port of San Francisco with a passport duly visaed and applied for admission into the United States as the wife of a Japanese merchant. At a hearing by the Board of Special Inquiry petitioner was denied admission into the United States. Petitioner claims the right to enter under and by authority of article 1 of the treaty of Commerce and Navigation of February 21, 1911, between the United States and Japan (37 Stat. 1504) as a nonimmigrant under section 3(6) of the Immigration Law of 1924 (8 USCA § 203). Article 1 of that treaty is as follows: "The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

The Immigration Law of 1924 classes as nonimmigrants aliens seeking admission to the United States and "entitled to enter the United States solely to carry on trade under and in pursuance of the provisions of a present existing treaty of commerce and navigation." Section 3, subd. 6 (8 USCA § 203(6).

The right of the wife of a treaty merchant to admission is not seriously questioned. See Cheung Sum Shee et al. v. Nagle, 268 U. S. 336, 45 S. Ct. 539, 69 L. Ed. 985.

The principal point involved in this case is the question of whether or not an alien who is the editor of a Japanese newspaper published in San Francisco and distributed lo-

cally, but who is not the proprietor or publisher of such paper, is an "alien entitled to enter the United States solely to carry on trade under and in pursuance of the provision of a present existing treaty of commerce and navigation."

In pursuance of the authority given in section 24 of the Immigration Act of 1924 (8 USCA § 222) to prescribe rules and regulations for the enforcement of that act, the Commissioner General of Immigration, with the approval of the Secretary of Labor, and the Secretary of State, on the recommendation of the Secretary of Labor, has adopted the following regulations:

"58. In order to obtain a visa under the statutory and treaty provisions referred to the applicant must show that he is going to the United States in the course of a business which involves, substantially, trade or commerce between United States and the territory stipulated in the treaty. For example, one going to the United States as a member or agent of a commercial concern in his own country, in transactions involving commerce between the two countries, or one going to the United States with a stock of goods produced in his own country, to be sold in the United States and to be replenished from other goods produced in his own country, would be entitled to the benefits of the statutory and treaty provisions in question.

"59. The distinction to be observed is between the case of one engaged in trade or commerce between the two countries and the case of an immigrant or settler who seeks to come without such a relation to commerce, but who may thereafter engage in purely local transactions which lie outside the purposes of the commercial treaties."

 These regulations purport to restrict the right to enter the United States to those engaged in trade between Japan and the United States, wholesale or retail. If these regulations conflict with an act of Congress or with a treaty, which is the law of the land (U. S. Const. art. 6, cl. 2), they would to that extent be void. Johnson v. Keating ex rel. Tarantino (C. C. A.) 17 F.(2d) 50, citing Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294. See, also, U. S. v. 11150 lbs. of Butter (C. C. A.) 195 F. 657; St. Louis Independent Packing Co. v. Houston (C. C. A.) 215 F. 553. Otherwise they have the force of law. U. S. v. Ormsbee (D. C.) 74 F. 207. In any event, these rules are entitled to serious consideration as an interpretation of the treaty by the executive department of the government. In this regard the decision of the Board of Special Inquiry which passed on the petitioner's right to enter the United States, recites that the question of the treaty rights of the applicant have been submitted to the Department of State and that the reply had been adverse to that right as follows:

"The record indicated that the husband was employed as an editor for Japanese newspapers published in Los Angeles. This Department did not understand on what basis a 3 (6) visa was granted to the wife, and therefore, referred the case to the State Department with the request that this Department be advised whether that Department regards the husband as entitled to a status as a treaty merchant within the meaning of Section 3, Subdivision 6 of the Immigration Act of 1924.

"Under date January 9th, 1929, the State Department replied that as the male alien is engaged in a purely local enterprise which has little if anything to do with international trade and commerce he is not entitled to a treaty status with Japan. This Department concurs in that finding. Consequently the request for change of status on behalf of the male alien must be denied. The woman is not entitled to admission under Subdivision 6 of Section 3."

The provisions of article 1 of the treaty with Japan have been considered by our Supreme Court. In the case of Asakura v. City of Seattle, 265 U. S. 342, 44 S. Ct. 515, 68 L. Ed. 1041, in an opinion delivered by Justice Butler, it was held that the phrase "to carry on trade" was broad enough to cover a local pawnbroker's business established in Seattle, and there is no suggestion that the treaty right is confined to international trade. An ordinance of the city of Seattle which denied the right of an alien to carry on the business of pawnbroker was therefore held to be void because in conflict with this treaty so far as it undertook to prohibit a Japanese subject from engaging in such business. In that case the court expressly reserved the question of the right of a Japanese subject to enter the United States under the treaty as not involved in the decision. Id., page 343 of 265 U. S., 44 S. Ct. 515. In the case of Jordan, Secretary of State of California, v. Tashiro, 278 U. S. 123, 49 S. Ct. 47, 48, 73 L. Ed. 214, the Supreme Court had occasion to again interpret the provisions of this article of the treaty with Japan, Justice Stone delivering the opinion of the court. It was there contended that the treaty did not extend to such an enter-

prise, and that the right to "trade" and carry on "commerce" was limited to the sale and exchange of goods and commodities. In answer to that contention the court stated its conclusion as follows:

"While in a narrow and restricted sense the terms 'commerce,' or 'commercial,' and 'trade' may be limited to the purchase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not necessarily involve trading in merchandise. Asakura v. Seattle, supra. And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse. See Gibbons v. Ogden, 9 Wheat. 1, 189, 6 L. Ed. 23.

"Considerations which led this court to conclude that the terms 'trade' and 'commerce' as used in this treaty do not include agriculture, and the circumstances attending the making of the treaty which were deemed to exclude from the operation of its broad language any grant of the privilege of acquiring and using lands within the United States for agricultural purposes, were discussed in the opinions in Terrace v. Thompson, 263 U. S. 197, 223, 44 S. Ct. 15, 68 L. Ed. 255, Webb v. O'Brien, 263 U. S. 313, 323, 44 S. Ct. 112, 68 L. Ed. 318, Frick v. Webb, 263 U. S. 326, 333, 44 S. Ct. 115, 68 L. Ed. 323, and need not now be detailed. But in Asakura v. Seattle, supra, it was held that the language of this treaty securing to Japanese citizens the privilege of carrying on trade within the United States was broad enough to comprehend all classes of business which might reasonably be embraced in the word 'trade,' and included the privilege of carrying on the business of a pawnbroker. In Clarke v. Deckebach, 274 U. S. 392, 396, 47 S. Ct. 630, 71 L. Ed. 1115, in considering the treaty with Great Britain of July 3, 1815, 8 Stat. 228, and August 6, 1827, 8 Stat. 361, granting reciprocal liberty of commerce between the United States and Great Britain, and in holding that the guarantee that ' * * * the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce,' did not extend to a British subject engaged in keeping a poolroom within the United States, we took occasion to point out that the language of the present treaty with Japan was of broader scope than that then before the court.

"Giving to the terms of the treaty, as we are required by accepted principles, a liberal rather than a narrow interpretation, we think, as the state court held, that the terms 'trade' and 'commerce,' when used in conjunction with each other and with the grant of authority to lease land for 'commercial purposes' are to be given a broader significance than that pressed upon us, and are sufficient to include the operation of a hospital as a business undertaking; that this is a commercial purpose for which the treaty authorizes Japanese subjects to lease lands."

It was held, therefore, that the Anti-Alien Land Law of California (Cal. St. 1923, p. 1020), which prohibited leases to aliens ineligible to citizenship unless the right was secured to them by treaty, did not prohibit the lease in question.

The Supreme Court has also had to determine similar questions under a similar, but not identical, treaty with China. In Cheung Sum Shee et al. v. Nagle, 268 U. S. 336 [45 S. Ct. 539, 69 L. Ed. 985], Justice McReynolds delivered the opinion of the court as follows:

"The present existing treaty of commerce and navigation with China, dated November 17, 1880, 22 Stat. 826, 827, provides:

" 'Article II. Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation.'

"An alien entitled to enter the United States 'solely to carry on trade' under an existing treaty of commerce and navigation is not an immigrant within the meaning of the Act, § 3(6) [8 USCA § 203(6)] and therefore is not absolutely excluded by section 13 [8 USCA § 212].

"The wives and minor children of resident Chinese merchants were guaranteed the right of entry by the treaty of 1880 and certainly possessed it prior to July 1st when the present Immigration Act became effective. United States v. Mrs. Gue Lim [176 U. S. 459, 20 S. Ct. 415, 44 L. Ed. 544], supra. That act must be construed with the view to preserve treaty rights unless clearly annulled, and we cannot conclude that, considering its history, the general terms therein

disclose a congressional intent absolutely to exclude the petitioners from entry.

"In a certain sense it is true that petitioners did not come 'solely to carry on trade.' But Mrs. Gue Lim did not come as a 'merchant.' She was nevertheless allowed to enter, upon the theory that a treaty provision admitting merchants by necessary implication extended to their wives and minor children. This rule was not unknown to Congress when considering the act now before us.

"Nor do we think the language of section 5 [8 USCA § 205] is sufficient to defeat the rights which petitioners had under the treaty. In a very definite sense they are specified by the act itself as 'nonimmigrants.' They are aliens entitled to enter in pursuance of a treaty as interpreted and applied by this court 25 years ago."

In U. S. v. Mrs. Gue Lim, 176 U. S. 459, 20 S. Ct. 415, 418, 44 L. Ed. 544, it was held that a reasonable construction of the treaty and of the Chinese Exclusion Act required the admission of the wife and minor children as an incident to the right of the merchant himself, and there stated the rule that should control the judiciary in the interpretation of statutes where a strict construction of the statute would conflict with a treaty of the United States, as follows:

"'The court should be slow to assume that Congress intended to violate the stipulations of a treaty so recently made with the government of another country. * * * Aside from the duty imposed by the Constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact that the honor of the government and the people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected. And it would be wanting in proper respect for the intelligence and patriotism of a co-ordinate department of the government were it to doubt, for a moment, that these considerations were present in the minds of its members when the legislation in question was enacted.' We ought, therefore, to so consider the act, if it can reasonably be done, as to further the execution, and not to violate the provisions, of the treaty."

In Cheung Sum Shee v. Nagle, 268 U. S. 336, 45 S. Ct. 539, 540, 69 L. Ed. 985, the court, following the rule announced in the Gue Lim Case, supra, said:

"That act must be construed with the view to preserve treaty rights unless clearly annulled, and we cannot conclude that, considering its history, the general terms therein disclose a congressional intent absolutely to exclude the petitioners from entry."

■ It would seem clear from the foregoing authorities interpreting the Immigration Act of 1924, § 3, subd. 6 (8 USCA § 203), that the right to enter the United States as a nonimmigrant under a treaty of commerce and navigation is not confined to those who engage or intend to engage in foreign commerce, unless, of course, the treaty confines the rights therein granted to those so engaged, in which case the Immigration Act would limit the right of entry to those covered by the treaty.

■ The next question then is: Does the treaty extend the right of entry to the editor of a newspaper? That the publisher of a newspaper who manufactures and sells newspapers is engaged in trade within the meaning of the treaty seems clear from the foregoing authorities, but it does not necessarily follow that the editor thereof who is an employee of the publisher and engaged in literary pursuits is likewise engaged in trade or commerce. The treaty with Japan, however, has not left that matter in doubt, for it is therein expressly provided that the Japanese subject shall have the right "to employ agents of their choice * * * incident to or necessary for trade" (see article 1, supra), and that right is evidently vouchsafed with a view to the use of such of his fellow citizens as may be deemed by him to be and are in fact reasonably necessary to carry on his trade or commerce. The selection of a Japanese as an editor of a newspaper edited and published in the Japanese language would seem to be a reasonable exercise of the right of choice granted to the publisher by the treaty. In view of this clause of article 1 of the treaty above set forth, it would seem clear that a subject of Japan so selected and engaged is engaged in trade, within the meaning of the Immigration Act of 1924, as above set forth (section 3, subd. 6, supra). It follows that the petitioner, his wife, is entitled to admission as a reasonable corollary to his right under the decisions hereinabove set forth. U. S. v. Mrs. Gue Lim, 176 U. S. 459, 20 S. Ct. 415, 44 L. Ed. 544, supra.

The order is reversed.