In the Matter of the Application of ANTHONY A. MAGNANI, Petitioner, Respondent, for an Order Pursuant to Article 78 of the Civil Practice Act, against CHARLES A. HARNETT (CARROLL E. MEALEY), as Commissioner of Motor Vehicles of the State of New York, Appellant, and PATRICK MATTHEWS, Impleaded Respondent.*

Third Department, July 11, 1939.

* Revg. 169 Misc. 697.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General, Vincent Kiebala, Assistant Attorney-General*, of counsel], for the appellant.

*Roy P. Monahan* [*James F. Sharkey* of counsel], for the petitioner, respondent.

Order reversed, on the law and facts, with fifty dollars costs and disbursements, and petition dismissed, with fifty dollars costs.

HILL, P. J., BLISS and HEFFERNAN, JJ., concur; HILL, P. J., with a memorandum, in which HEFFERNAN, J., concurs; HEFFERNAN, J., in a separate opinion; CRAPSER, J., dissents, and votes for affirmance, with an opinion.

HILL, P. J. (concurring). I favor a reversal of the order appealed from on the authority of *Asakura* v. *Seattle* (265 U. S. 332) and *Matter of Ennis* v. *Harnett* (243 App. Div. 516), and upon the further ground that the statute is unconstitutional under the Fourteenth Amendment of the Federal Constitution, and further, the State Constitution provides: " No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person * * *, or by the State or any agency or subdivision of the State." (State Const. art. 1, § 11.)

The broad language of the century-old treaty with England has always been construed to place her nationals, within our borders, in as favorable a position as the nationals of nations with whom later and more definite treaties have been made. I oppose a judicial decision committing the State of New York to a policy

whereunder the nationals of Germany, Italy and Japan are more favored than those of England.

I favor a reversal upon the ground that the statute as applied to this petitioner violated the treaty and is in violation of both the Federal and the State Constitutions.

HEFFERNAN, J., concurs.

HEFFERNAN, J. (concurring). The Commissioner of Motor Vehicles of the State is appealing from an order of the Albany Special Term of the Supreme Court, directing him to rescind, revoke and annul the chauffeur's license of the respondent, Matthews, alleged to have been issued to him in violation of subdivision 1-a of section 20 of the Vehicle and Traffic Law.

The petitioner, Magnani, is a citizen of the United States, duly licensed and employed as a professional chauffeur.

The respondent, Matthews, is a subject of Great Britian, resident of the State of New York, and licensed as a chauffeur in this State. Up to the time Matthews was issued his chauffeur's license he had never filed an official declaration of his intention to become a citizen of the United States.

In his petition for a revocation of the license petitioner alleged that the act of the Commissioner of Motor Vehicles in issuing such license was illegal, capricious and arbitrary.

The pertinent provisions of subdivision 1-a of section 20 are: " No chauffeur's license shall be issued to any applicant twenty-one years of age or over, nor, if issued, shall be valid, unless the applicant therefor shall be an American citizen, or shall have within six years preceding the date of issue of the such license, filed an official declaration of his intention to become a citizen of the United States."

The language of the statute is plain and unambiguous. The granting of chauffeurs' licenses is limited to citizens and alien declarants. Obviously, the basis of this regulatory act is alienage.

The inhibition contained in the statute is unqualified. It applies to aliens who desire employment as chauffeurs, as well as those who, but for these provisions, might own and personally operate a motor vehicle for hire. It applies not only to operators of buses and taxicabs, but also to those who drive all types of commercial vehicles.

In view of the unqualified prohibition of the statute in question against alien chauffeurs it is quite obvious that it conflicts with the terms of the treaties of 1794 and 1815 between the United States and Great Britain and is, therefore, unconstitutional and void.

The Treaty of Amity, Commerce and Navigation with Great Britain, commonly called the Jay Treaty, was concluded in 1794. Article II thereof, after making provision for the evacuation of all troops and garrisons from all posts and places within the boundary lines assigned by the treaty of peace (1783) to the United States, then continues as follows: " All settlers and traders, within the precincts or jurisdiction of the said posts, shall continue to enjoy, unmolested, all their property of every kind, and shall be protected therein."

The Treaty of 1815 to Regulate Commerce and Navigation contains the following provisions in article I thereof: " There shall be between the territories of the United States of America, and all the territories of His Britannick Majesty in Europe, a reciprocal liberty of commerce. The inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports and rivers, in the territories aforesaid, to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of the said territories, respectively; also to hire and occupy houses and warehouses for the purposes of their commerce; and, generally, the merchants and traders of each nation respectively shall enjoy the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively."

The language used in the 1794 treaty that " settlers and traders * * * shall continue to enjoy, unmolested, all their property of every kind " is not to receive a narrow construction. The protection intended to be afforded by the quoted words comprehends vastly more than property ownership. It insures to a subject of Great Britain the right to engage in commerce, trade, business or labor on the same terms as our own citizens. The promise contained in the covenant to enjoy property rights carries with it, by necessary implication, the right to every incident essential to the full enjoyment of such property. The enjoyment of such benefits surely is not restricted, as contended by petitioner, to limited areas, namely, within the jurisdiction of posts as that term was used in the treaty. This contention finds no support in the terms of the treaty. It will be noted that article II which secures the rights in question refers to " posts and places within the boundary lines assigned by the Treaty of Peace (1783) to the United States " and then again in speaking of British subjects refers to all those who " reside within the said boundary lines."

The provisions of the treaty of 1794 are very full and comprehensive, and were intended to cover not only the conditions and

problems which existed at the time of its signing but also to meet circumstances and contingencies which were to arise in the future.

The good faith of treaties requires that their obligations should be liberally construed. As was stated by the court in *Jordan* v. *Tashiro* (278 U. S. 123): " The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. * * * Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred."

It is equally clear that the provisions of the treaty of 1794 were intended to embrace all the ordinary occupations and trades. (*Matter of Tiburcio* v. *Parrott*, 1 Fed. 481.)

We pass now to the treaty of 1815. The latter portion of article I provides as follows: " Generally, the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce." Here again the word " commerce " should be given the broadest meaning consistent with the purposes and ends sought to be attained by the treaty. The rules of interpretation invoked in construing the language of the treaty of 1794 apply with like effect to the provisions in the later treaty. The broader meaning of the term " commerce " embraces the gainful occupation of driving a motor vehicle for hire. This is particularly true where one intends to operate his motor vehicle under circumstances requiring a license as a chauffeur.

Under the " most favored nation " doctrine which prevails in our relations with Great Britain, these treaties and the nationals thereunder are entitled to as free a scope in commercial activity as the nationals of China, Japan and Germany under later and more exclusive treaties. The effect of the order under review is to deny to the subjects of Great Britain the same freedom in commercial activities which we accord to the nationals of China, Japan and Germany. No such distinction should be made and none is warranted by the language of the respective treaties.

The treaties with Great Britain are the supreme law of the land and supersede all local laws inconsistent with their terms. (U. S. Const. art. VI, cl. 2; *Ware* v. *Hylton*, 3 Dallas [U. S.], 199.) Hence the provisions of subdivision 1-a of section 20 of the Vehicle and Traffic Law must fall.

Under the Fourteenth Amendment to the Constitution of the United States, alien inhabitants of a State may not be deprived of life, liberty or property, without due process of law, nor be denied

the equal protection of the laws. (*Terrace* v. *Thompson,* 263 U. S. 197; *Yick Wo* v. *Hopkins,* 118 id. 356; *Truax* v. *Raich,* 239 id. 33.)

The case of *Asakura* v. *Seattle* (265 U. S. 332) seems to be decisive of the question before us. In that case it appeared that the city of Seattle had passed an ordinance regulating the business of pawnbroker and making it unlawful for any person to engage in the business unless he had a license. To procure a license one had to be a citizen of the United States. The petitioner, a Japanese, brought suit against the comptroller and chief of police to restrain them from enforcing the ordinance against him. He claimed that the ordinance violated the treaty between the United States and Japan dated April 5, 1911. The court held the ordinance unconstitutional because of violation of the treaty.

The Special Term, as appears from its opinion, relied largely on *Gizzarelli* v. *Presbrey* (44 R. I. 333; 117 A. 359). In that case the court upheld the right of the State to deny the privilege of motor vehicle operation to an alien. The court based its conclusion on the theory that the use of the public highways is a privilege and not a right and hence subject to no restraints in the exercise of the police power of the State in connection therewith. We are not willing to adopt that conclusion. Granting that the use of highways is a privilege, such use may not be denied because of alienage. (*People* v. *Crane,* 214 N. Y. 154.) In that case the court said: " Aliens may use the public highways as freely as citizens."

The principle is well-settled that a State may by statutes discriminate against aliens despite treaties of amity and commerce. Legislation of this nature is, however, confined to matters involving the proprietary interests of the State.

The basis for such discrimination was aptly stated in *People* v. *Crane (supra),* where the court said: " The power of a State to discriminate between citizens and aliens in the distribution of its own resources is sanctioned alike by decisions of the courts and by long continued practice. Neither aliens nor the citizens of other States are invested by the Constitution with any interest in the common property of the people of this State. * * * It has been held, therefore, that a State may deny to aliens, and even to citizens of another State, the right to plant oysters or to fish in public waters. * * *

" The principle that justifies these discriminations is that the common property of the State belongs to the people of the State and hence that, in any distribution of that property, the citizen may be preferred."

So in *Patsone* v. *Pennsylvania* (232 U. S. 138) the State restricted the use of a shot gun in hunting wild game to citizens of the State and the statute was upheld.

This same principle was applied to the employment of none but citizens on public works. (*Atkin* v. *Kansas*, 191 U. S. 207; *Heim* v. *McCall*, 239 id. 175.)

The court in these cases was careful to point out that such regulatory legislation in no way interferes with any personal right which an alien may have, by treaty or otherwise, to engage in commerce, trade or labor on the same terms as citizens with any one who is willing to deal and contract with him.

Here we are dealing not with proprietary interests of the State but with the right of aliens to engage in common occupations. Licensing powers cannot be used as a guise to defeat rights secured by treaties.

The order appealed from should be reversed, with fifty dollars costs and disbursements, and the motion denied, with fifty dollars costs.

CRAPSER, J. (dissenting). This is an appeal from an order of the Albany Special Term directing the Commissioner of Motor Vehicles of the State of New York to revoke and annul the chauffeur's license of the respondent, Patrick Matthews, alleged to have been issued to him in violation of subdivision 1-a of section 20 of the Vehicle and Traffic Law of the State of New York.

The petitioner-respondent is a chauffeur licensed pursuant to the provisions of the Vehicle and Traffic Law of the State of New York and is a citizen of the United States.

The respondent, Patrick Matthews, is a subject of Great Britain, a resident of the State of New York and licensed as a chauffeur in the State.

The petitioner alleged that the act of the Commissioner of Motor Vehicles in issuing the aforesaid license to the respondent, Patrick Matthews, was illegal, capricious and arbitrary and in violation of the provisions of subdivision 1-a of section 20 of the Vehicle and Traffic Law.

Subdivision 1-a of section 20 of the Vehicle and Traffic Law provides:

" 1-a. Citizenship required. On and after the first day of June, nineteen hundred thirty-three, and until the first day of June, nineteen hundred thirty-nine, no chauffeur's license shall be issued to any applicant twenty-one years of age or over, nor, if issued, shall be valid, unless the applicant therefor shall be an American citizen, or shall have within six years preceding the date of the issue of such

license, filed an official declaration of his intention to become a citizen of the United States. On and after the first day of June, nineteen hundred thirty-nine, no chauffeur's license shall be issued to any applicant twenty-one years of age, or over, nor, if issued, shall be valid, unless the applicant therefor shall be an American citizen. The provisions of this subdivision shall not apply to a person who because of his nationality is precluded from becoming a citizen of the United States, provided he shall have resided in the United States continuously for five years prior to the first day of June, nineteen hundred thirty-three and shall have been licensed in this State as a chauffeur during three full years prior to said first day of June, nineteen hundred thirty-three, nor to a chauffeur employed by an alien while such alien is sojourning or traveling in this country for a period not exceeding six months."

It is the contention of the appellant that where there is a conflict between a State statute and a treaty entered into by the United States and a friendly nation, the provisions of the treaty are superior and must prevail as against such statute.

It is further contended that such statute is not void, but is merely suspended during the continuance of the treaty, in so far as it is in conflict with the treaty provisions.

The question involved is whether subdivision 1-a of section 20 of the Vehicle and Traffic Law conflicts with the treaties between the United States and Great Britain.

The Treaty of Amity, Commerce and Navigation with Great Britain, commonly called the Jay Treaty, was concluded in 1794. Article II thereof, after making provision for the evacuation of all troops and garrisons from all posts and places within the boundary lines assigned by the treaty of peace (1783) to the United States, then continues as follows: "All settlers and traders, within the precincts or jurisdiction of the said posts, shall continue to enjoy, unmolested, all their property of every kind, and shall be protected therein."

The Treaty of 1815 to Regulate Commerce and Navigation contains the following provisions in article I thereof: "There shall be between the territories of the United States of America, and all the territories of His Britannick Majesty in Europe, a reciprocal liberty of commerce. The inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports and rivers, in the territories aforesaid, to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of the said

territories, respectively; also to hire and occupy houses and warehouses for the purposes of their commerce; and, generally, the merchants and traders of each nation respectively shall enjoy the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively."

I cannot see that the treaty of 1794 has any application to the question involved in the present case. That treaty simply gave to settlers and traders within the precincts or jurisdiction of said posts the right to continue to enjoy unmolested all their property of every kind. The right was limited to certain persons within the jurisdiction of said posts; it was not a general grant and, therefore, I do not believe that it was applicable to this case.

Under the treaty of 1815 the merchants and traders of each nation were given the right of protection and security for their commerce. The privilege of chauffeurs' licenses does not come within either treaty. It is a matter that the State has a right to regulate under its police power for the protection of the public and its citizens; it is not a matter of commerce. It does not grant to the inhabitants of Great Britain power to enter this country and to receive a privilege which under the laws of the State of New York is limited to those who are citizens or who have declared their intention of becoming such. (*Bobe* v. *Lloyds*, 10 F. [2d] at p. 734.)

The constitutionality of subdivision 1-a of section 20 of the Vehicle and Traffic Law is not in question.

The case of *Clarke* v. *Deckebach* (274 U. S. 392) is a case where there was a city ordinance forbidding a license to operate pool and billiard rooms to aliens and it was held that it was not a violation of treaty between Great Britain and the United States because the proprietor of a pool room does not engage in commerce within the meaning of the treaty which merely extends to merchants and traders protection of their commerce.

The case of *Asakura* v. *Seattle* (265 U. S. 332) is relied upon by the appellant. That was a case where the city of Seattle had passed an ordinance regulating the business of pawnbrokers and making it unlawful for any person to engage in such a business unless he had a license. To secure a license he had to be a citizen of the United States. The petitioner, a Japanese, brought suit to restrain the enforcement of the ordinance against him. He claimed that the ordinance violated the treaty between the United States and Japan dated April 5, 1911. The court held the ordinance unconstitutional because it was a violation of the treaty. The

treaty with Japan provided that the citizens or subjects of each of the contracting parties, had the right to do anything incidental to or necessary for trade, upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established. This language of the Japanese treaty is much broader than the treaty with England. As to the things covered by it, the provision establishes a rule of equality of Japanese subjects while in this country and native citizens and the rule established by it cannot be rendered nugatory in any part of the United States by municipal ordinance or State law. The purpose of the ordinance was to regulate and not to prohibit the business of pawnbrokers but it made it impossible for aliens to carry on the business. There is no question that a pawnbroker is engaged in a business; he loans money upon collateral and in case the pledge is not redeemed he sells the goods to get back the money that he has loaned on the pledge. It is different from that of a chauffeur.

The opinion written at Special Term cites *Gizzarelli* v. *Presbrey* (44 R. I. 333; 117 A. 359). In that case it was said: " Authority to use the public highways as a common carrier of passengers for hire is not a right belonging to the individual but is in the nature of a privilege." It held that the ordinance was an enactment made in the exercise of police power.

In *Commonwealth* v. *Hana* (195 Mass. 262; 81 N. E. 149) the court upheld a statute regulating the occupation of hawker and peddler, and limiting the issuance of licenses to citizens of the United States.

The order appealed from should be affirmed, with costs to the petitioner.