NORMAN GREIG, ETC., ET AL., Plaintiffs and Appellants, v. JOSÉ R. NOGUERA, SECRETARY OF THE TREASURY OF THE COMMONWEALTH OF PUERTO RICO, Defendant and Appellee.

Nos. 12725, 12726. Decided November 1, 1962.

*Hartzell, Fernández & Novas* for appellants. *J. B. Fernández Badillo, Solicitor General,* and *Genoveva R. Carrera, Assistant Solicitor General,* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

These are two actions which have resulted from the same facts and in which the issues are also the same. We will therefore consider and decide both actions in this opinion.

█ The appellant was a subject of the United Kingdom of Great Britain, a native of Scotland, and a resident in the state of North Carolina in the United States, who received income during the years 1949 to 1953, inclusive, from sources within Puerto Rico. He reported such income and paid the income tax at the rate of 7 per cent. The Secretary of the Treasury of the Commonwealth of Puerto Rico (formerly

Treasurer of Puerto Rico) notified him deficiencies based on the reasoning that since appellant was an alien citizen not residing in Puerto Rico, he should have paid the tax rate of 29 per cent provided by the Income Tax Act of 1924, 13 L.P.R.A. § 691.[1] After the corresponding proceedings of reconsideration and final notice, the appellant paid the tax as computed by the Secretary of the Treasury and filed two claims for refund based, one, on the difference between the amount of the tax paid and the amount thereof if it had been assessed at the rate of 7 per cent, and the other, on the personal exemption of $2,000 allowed by the Act to married persons who live with their spouses, which exemption appellant, through inadvertence, failed to claim in his return. Both petitions for refund were disallowed and the appellant appealed to the Superior Court, which sustained the Secretary of the Treasury. The issue involves only the years 1950–1953, since appellant admitted the defense of prescription raised by the defendant with respect to the year 1949 in case No. 12726.

■ Plaintiff relies on Art. XXI of the convention existing between the United Kingdom of Great Britain and the United States respecting income taxes.[2] By virtue of that convention, he contends, he should pay taxes in Puerto Rico on income received from this country as would a nonresident citizen of the United States, that is, at the same rate as a resident citizen. Federal Relations Act, § 2, Laws of Puerto Rico Annotated, Vol. 1, p. 158 (1954); *Postley* v. *Secretary of the Treasury*, 75 P.R.R. 822.

On the other hand, the Secretary relies on Art. II of the

---

[1] The provisions equivalent to the provision *supra* of the present Income Tax Act of 1954 is found in 13 L.P.R.A. § 3211. In the case of nonresident aliens the gross income includes only the gross income from sources within Puerto Rico. 13 L.P.R.A. § 3212.

[2] Convention between the United States of America and the United Kingdom respecting double taxation and taxes on income, 60 Stat. 1377 (1946); 6-I U. S. Treaties and Other International Agreements 37 (1955); 9 UST 1329 and 1459.

same document. He maintains that this article excluded Puerto Rico from the ambit of the agreement. In order to construe and apply them, let us examine the provisions of the convention which come into play in this case.

Article I provides in its pertinent part that it covers the income tax laws of the United States and of the United Kingdom of Great Britain and "any other taxes of a substantially similar character imposed by either Contracting Party subsequently to the date of signature of the present Convention or by the government of any territory to which the present Convention is extended under Art. XXII." [3]

Article II provides that the term "United States" means "the United States of America, and when used in a geographical sense means the States, the Territories of Alaska and of Hawaii, and the District of Columbia." [4]

Article XXI provides that the nationals of one of the contracting parties shall not, while resident in the territory of the other contracting party, be subjected therein to other or more burdensome taxes than are the nationals of such other contracting party resident in its territory. In defining the term "nationals," as used in Art. XXI *supra*, said article provides that in relation to the United States "nationals" means "United States citizens, and all persons under the protection of the United States, from the United States or any territory to which the present Convention is applicable by reason of extension made by the United States under Art. XXII." The same article defines the term "taxes" and states

---

[3] The official text of the portion cited of Art. I reads as follows: "The present Convention shall also apply to any other taxes of a substantially similar character imposed by either Contracting Party subsequently to the date of signature of the present Convention or by the government of any territory to which the present Convention is extended under Article XXII." 60 Stat. 1378.

[4] The pertinent part of Art. II *supra* reads as follows: "In the present Convention, unless the context otherwise requires: (a) the term 'United States' means the United States of America, and when used in a geographical sense means the States, the Territories of Alaska and of Hawaii, and the District of Columbia." 60 Stat. 1378.

that in the context of that article the word taxes means "taxes of every kind or description, whether national, Federal, state, provincial or municipal." The official text of Art. XXI *supra* is transcribed verbatim at the foot of the page.[5]

Article XXII, to which reference is made in the above-mentioned articles, outlines the procedure for extending the agreement to territories under the dominion of the contracting countries, if the parties so wish. We do not believe it is necessary to copy it here, since it is not in issue in this case.

Should we adopt a strict construction of the agreement in question, we would have to agree with the Secretary of the Treasury, since Art. II in defining the term "United States," as noted before, mentions the federal states, the (then) territories of Alaska and Hawaii and the District of Columbia and does not mention Puerto Rico.[6] On the other hand, the

---

[5] "Article XXI

"(1) The nationals of one of the Contracting Parties shall not, while resident in the territory of the other Contracting Party, be subjected therein to other or more burdensome taxes than are the nationals of such other Contracting Party resident in its territory.

"(2) The term 'nationals' as used in this Article means

"(a) in relation to the United Kingdom, all British subjects and British protected persons, from the United Kingdom or any territory with respect to which the present Convention is applicable by reason of extension made by the United Kingdom under Article XXII; and

"(b) in relation to the United States, United States citizens, and all persons under the protection of the United States, from the United States or any territory to which the present Convention is applicable by reason of extension made by the United States under Article XXII;

and includes all legal persons, partnerships and associations deriving their status as such from, or created or organized under, the laws in force in any territory of the Contracting Parties to which the present Convention applies.

"(3) In this Article the word 'taxes' means taxes of every kind or description, whether national, Federal, state, provincial or municipal." 60 Stat. 1386.

[6] It should be recalled that the agreement was signed in Washington on April 16, 1945. 60 Stat. 1377. As is known, subsequent to that date

plaintiffs request that we adopt a liberal construction which would protect the rights conferred by the convention on the nationals of the contracting parties, namely, on the *United States citizens* and on the *British subjects* (Art. XXI of the Convention).

In what manner should this Court then construe the convention that we have before us? In the first place, it is well to clarify that it is the practice of the contracting countries to designate the international agreements by different names such as treaties, conventions, acts, protocols, agreements, compacts, "modi vivendi," statutes, and charters. However, no matter the designation used, it is a universal rule that once they are approved those agreements are binding on the contracting parties. V HACKWORTH, Digest of International Law 1–4 (1943); JESSUP, A Modern Law of Nations 123-124 (1952); *Harvard Research in International Law, Draft Convention on the Law of Treaties*, 29 Am.J.Int. L. Supp. 653, 667 and 710 (1935); McNAIR, Law of Treaties 3 (1938); BRIGGS, The Law of Nations 837 (2d ed. 1952); BRIERLY, The Law of Nations 195 (3d ed. 1942); BISHOP, International Law 86 (2d ed. 1962).

■■ In the second place, the general rule, which is also the rule adopted by the Supreme Court of the United States on the construction of treaties and other international agreements, is to the effect that they should be liberally construed so as to accomplish their objectives and give effect to their provisions. To those ends, restricted and technical constructions should be avoided. The Federal Supreme Court

Alaska and Hawaii became federal states of the American Union and Puerto Rico became a free associated state of that Union. As respects Puerto Rico, see Public Act No. 600, 64 Stat. 319 (1950); Constitution of the Commonwealth of Puerto Rico, Laws of Puerto Rico Annotated, Vol. 1, pp. 173–212 (1954); Public Act No. 447, 66 Stat. 327 (1952); Resolution No. 34 of the Constitutional Convention of Puerto Rico of July 10, 1952, Laws of Puerto Rico Annotated, Vol. 1, p. 134; Proclamation of the Governor of Puerto Rico of July 25, 1952, Laws of Puerto Rico Annotated, Vol. 1, p. 136.

has clearly established, expressing itself similarly on the matter on repeated occasions, that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor* v. *Laubenheimer*, 290 U.S. 276, 293; 78 L. Ed. 315, 324 (1933). In the opinion of the Court in that case, Mr. Justice Stone added at p. 324 that considerations which should govern the diplomatic relations between nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the intention of the parties to secure equality and reciprocity between them. To the same effect, see *Nielsen* v. *Johnson*, 279 U.S. 47, 51–52; 73 L. Ed. 607, 610 (1928); *Jordan* v. *Tashiro*, 278 U.S. 123, 127; 73 L. Ed. 214, 218 (1928); and *Asakura* v. *Seattle*, 265 U.S. 332; 68 L. Ed. 1041 (1924).

The rule stated is not recent. Already in 1830, Mr. Justice Story had expressed himself in similar terms in *Shanks* v. *Dupont*, 3 Pet. 242, 249. In 1879, Mr. Justice Swayne stated that the rule of liberal interpretation of the treaties was "the settled rule" in the United States Supreme Court, *Hauenstein* v. *Lynham*, 100 U.S. 483, 487. Reiterating the rule, that Court in the case of *De Geofroy* v. *Riggs*, 133 U.S. 258, decided in 1890, held that for the purposes of a convention entered into with France in 1853, property in the District of Columbia was in one "of the states of the Union." Following the same rule of liberal construction, the case of *Tucker* v. *Alexandroff*, 183 U.S. 424, 437; 46 L. Ed. 264, 270, was decided in 1902, and the rule was upheld in *Asakura* v. *Seattle*, *supra*, and in subsequent cases cited hereinabove. See, also, *Bacardí Corporation of America* v. *Domenech*, 311 U.S. 150; 85 L. Ed. 98 (1940). Article XIV of the convention under consideration, relative to capital gains, is construed in *American Trust Co.* v. *Smyth*, 247 F.2d 149 (1957) and decided in accordance with the liberal rule stated. The

court says at p. 153 that the treaty must be construed broadly and in the light of its objectives in order to achieve reciprocity between both contracting countries and equality of tax treatment among their citizens. Recently, the Supreme Court of the United States in reversing a restrictive construction of the Supreme Court of Oregon placed on a treaty with Yugoslavia, had occasion to say that it has many times set its face against interpretations that unduly restrict rights a treaty is adopted to protect. *Kolovrat* v. *Oregon*, 366 U.S. 187, 193 (1961). In addition to the judicial decisions cited on the matter, see HACKWORTH, *ibid.* at 222-234; LAUTERPACHT, The Development of International Law by the International Court 282-284 and 305-306 (Stevens & Sons Ltd., London, 1958) ; II HYDE, International Law, Chiefly as Interpreted and Applied by the United States 1478-1481 (2d ed. 1951) ; 29 Am. J. Int. L. Supp. 937-977 (1935) ; II ULLOA, *Derecho Internacional Público* 236-241 (4th ed. 1957) ; I ACCIOLY, *Tratado de Derecho Internacional Público* 655 and 663 (1958) ; GRASKE, in 10 Tul. L. Rev. 257 (1936) ; LENOIR, in I U. Chi. L. Rev. 602 (1934).

■■ We concede that the case at bar could conceivably be decided in accordance with the position taken by the Secretary of the Treasury by virtue of Art. II of the convention, as we already pointed out, but it may also be reasonably decided for plaintiffs by virtue of Art. XXI *supra*, particularly in the light of the law on the matter which we have here stated. That article provides in its subd. (2) (b) that it applies to *United States citizens*. Since all persons born in Puerto Rico are citizens of the United States,[7] that subdivision confers to the Puerto Ricans the right to invoke in Great Britain the benefits of the convention. It is only fair that the British subjects should be able to assert their corresponding right, under the same convention, here in Puerto Rico.

---

[7] Federal Relations Act, § 5b, Laws of Puerto Rico Annotated, Vol. 1, p. 162; 48 Stat. 1245.

Article XXI *supra* also provides in subd. (3) that it refers to taxes "*of every kind or description,* whether national, Federal, state, provincial or municipal." (Italics ours.) See footnote 5. In construing those provisions, it should be borne in mind, in addition to the considerations already stated, that since in this field restrictive constructions are not favored, the rule of *ejusdem generis* frequently invoked, wrongly or rightly, in municipal law, does not obtain here. *Factor* v. *Laubenheimer, supra;* McNAIR, Law of Treaties 207 (1938); HACKWORTH, *op. cit.* at 233.

We therefore adopt the construction which gives greater effect to the clauses of the convention and which makes possible the accomplishment of its purpose—not to impose more burdensome taxes on British subjects than those paid by nationals—and consequently decide in favor of the plaintiffs. We are persuaded that this is the better rule, particularly at a time in which for reasons which should be evident the nations of the world seek greater and closer economic relations. As an example of this, recall the growing *European Economic Community,* the *European Coal and Steel Community,* the *Organization of European Economic Cooperation,* the *Organization for Economic Cooperation and Development,* the *General Agreement on Tariffs and Trade,* the *International Development Association,* the *Special U. N. Fund for Economic Development,* the *International Finance Corporation,* the *International Bank for Reconstruction and Development,* the *International Monetary Fund,* the *International Coffee Agreement,* the *Inter American Development Bank,* the *Latin American Free Trade Area,* the *Coffee Federation of America,* and the *Economic Commission for Latin America.*

We also believe that the terror which nuclear war means has created the darkness from which a true dawn of international law will rise. The nations and humanity will not be able to continue in the present semianarchical state in which nations frequently have to take the law into their

hands. A generously wrought international law will contribute in some measure to achieve this goal.

The judgments rendered in these two cases by the Superior Court, San Juan Part, on June 29, 1959, will be reversed and the complaints in both cases will be sustained, without special award of costs, expenses, and attorney's fees.

