AMERICAN INTERNATIONAL GROUP, INC., The Continental Corporation, INA Corporation, American International Reinsurance Co., Ltd., American International Underwriters Overseas, Ltd., American Life Insurance Company, The Underwriters Bank Incorporated, Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN and Central Insurance of Iran (Bimeh Markazi Iran), Defendants.

Civ. A. No. 79–3298.

United States District Court, District of Columbia.

July 10, 1980.

Donald J. Mulvihill, David R. Hyde, Jr., Cahill, Gordon & Reindel, Charles N. Brower, Paul L. Friedman, Richard W. Reinthaler, Clay G. I. Small, George A. Lehner, James P. Laughlin, Harry G. Barlow and W. Michael Tupman, White & Case, Washington, D. C., for plaintiffs.

Thomas G. Shack, Jr., Christine C. Nettesheim, Abourezk, Shack & Mendenhall, John D. Aldock, Shea & Gardner, Washington, D. C., for defendants.

Royce C. Lamberth, Chief Civ. Div., Asst. U. S. Atty., Alice Daniel, Chief, Civ. Div., Justice Dept., R. Craig Lawrence, Washington, D. C., for government.

## ORDER

HART, District Judge.

This cause has come on for hearing before this Court upon plaintiffs' Motion for Partial Summary Judgment on the issue of liability. Plaintiffs comprise three groups of insurance companies, who, collectively represented all of the American insurance operations in Iran during 1979. American International Group, Inc. (hereinafter, "AIG") owned 35% of the equity of Iran America International Insurance Company (Nottingham affidavit, ¶ 3); INA Corporation (hereinafter, "INA") owned 20% of the equity interest in Bimeh Shargh, an Iranian corporation engaged in the insurance business (Cox affidavit, ¶¶ 2, 9); Continental Corporation (hereinafter, "Continental") owned 10% of the equity interest in Hafez Insurance Company, Ltd., an Iranian corporation which, prior to mid-1979, was engaged in the business of issuing and selling general property and casualty insurance in Iran (Lindell affidavit, ¶¶ 3, 8). Defendant Islamic Republic of Iran ("Iran") is a sovereign state and is a party to the bilateral Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, which entered into force June 16, 1957 (hereinafter, "the Treaty"). 8 U.S.T. 899, T.I.A.S. 3853, 284 U.N. T.S. 93. Defendant Central Insurance of Iran (Bimeh Markazi Iran) (hereinafter, "CII") is a governmental agency or instrumentality of Iran within the definition of 28 U.S.C. § 1603(b), which was created in 1971 for the purposes of (a) carrying on the commercial enterprise and business of issuing reinsurance, underwriting large and specialized risks and the like, and (b) overseeing and superintending the insurance industry in Iran. CII engages in commercial and business activities within Iran and within the United States, and its commercial activities have direct effects in the United States.

Article XI, paragraph 4 of the Treaty of Amity expressly provides:

> No enterprise of either High Contracting Party, including corporations, associations, and governmental agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Article IV, paragraph 2 of the Treaty provides:

> Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property

taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

On June 25, 1979 the insurance industry in Iran was nationalized. The nationalization was effected by "The Law of Nationalization of Insurance Companies" which provides in part:

> Paragraph 1. To protect the rights of insurers, to expand the insurance industry over the entire State, and to instruct it in the service of people, from the date of ratification of this law, all insurance companies of the State are proclaimed nationalized with acceptance of the conditioned legitimate principle of possession.

Nationalization came without warning. Immediately prior to the time of nationalization, CII officials assured officials of the Iranian insurance companies as well as officers of plaintiffs that no nationalization was intended (Lindell affidavit, ¶ 18; Cox affidavit, ¶ 6; Nottingham affidavit, ¶ 19). Immediately following nationalization defendant CII assumed control of plaintiffs' business and assets in Iran. The nationalization has had the effect of terminating all reinsurance and other business relations between the plaintiffs and defendants and the Iranian insurance companies in which plaintiffs had invested (Nottingham affidavit, ¶ 21; Cox affidavit, ¶ 7; Lindell affidavit, ¶ 20). Subsequent to the nationalization, relations between Iran and the United States have deteriorated to the point that the President determined on November 14, 1979 that a threat to the national security, foreign policy, and economy of the United States required a "freeze" on property located in the United States belonging to Iran. 44 Fed.Reg. 65956–65959 (Nov. 15, 1979). Simultaneously, Iran repudiated its debt obligations to United States banks.

Iran has consistently and notoriously failed to honor its duties, responsibilities, and obligations. The plaintiffs have not received compensation for their losses due to the nationalization, nor does the law of Iran, including "The Law of Nationalization of Insurance Companies," provide a mechanism for determining and paying compensation.

This Court has considered the legal memoranda and arguments of counsel and the affidavits and statements of material facts submitted therewith. It appears to this Court that no genuine issue exists as to any material fact. It also appears to this Court as follows:

■ (1) Defendants' nationalization without a mechanism for adequate compensation violates the Treaty of Amity and, independently, international law. The weight of authority manifestly states that international law, as reflected in the Treaty, requires prompt, adequate, and effective compensation. *Banco Nacional de Cuba v. Sabbatino*, 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd*, 307 F.2d 845 (2d Cir. 1962), *rev'd on other grounds*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Banco Nacional de Cuba v. Chase Manhattan Bank*, No. 60 Civ. 4663, slip op. (S.D.N.Y. Jan. 4, 1980).[1] The "Law of Nationalization" does not provide a mechanism for determination and payment of prompt compensation relevant to this case (Aghayan affidavit, ¶¶ 8, 10). There has been no compensation either paid or offered. Though the exact scope and precise requirements of the Treaty and international law may be subject to interpretation, the defendants in this case have failed by any interpretation to meet even the minimum standards set by the Treaty and international law.

---

**1.** International custom reflects the practice of nations; general principles of law recognized by civilized nations are evidenced by the proclamations of nations individually and collectively. At its seventeenth session, the General Assembly of the United Nations adopted, by a vote of 87 to 2, with 12 abstentions, a resolution providing, in pertinent part, that: "Nationalization, expropriation, or requisitioning shall be based on grounds or reasons of public utili-

ty, security or the national interest which are recognized as overriding purely individual or private interests, both domestic or foreign. In such cases the owner shall be paid appropriate compensation, in accordance with the rules in force in the state taking such measures in the exercise of its sovereignty and in accordance with international law." U.N.Gen.Ass. Off.Rec. 17th Sess., (A/PV1193, 1194) (1962); G.A. Res. 1803 (XVII).

(2) Venue and jurisdiction is proper in this Court regardless of the fact that plaintiffs have not exhausted their remedies by seeking judicial or administrative redress in Iran. Resort to such legal means is unnecessary when such remedy is impracticable or futile. *Eisen v. Eastman*, 421 F.2d 560 (2d Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). At the time of nationalization Iran was in such a state of turmoil that recourse to the Iranian courts was impossible. *Stromberg-Carlson Corp. v. Bank Melli Iran*, 467 F.Supp. 530, 532 n. 3 (S.D.N.Y.1979). Plaintiffs' employees were in physical danger, forced out of Iran, and generally unable to perform most of their ordinary duties during the period following the nationalization decree (2d Supp. Nottingham affidavit, ¶¶ 3–11). Further, the United States severed all diplomatic relations with Iran on April 7, 1980, and imposed a ban on travel to and from Iran on April 17, 1980. Executive Order No. 12211, Fed.Reg. 26685 (1980). It is absolutely clear that the Republic of Iran has shown a complete and utter disregard for international law by its seizure and holding of diplomatic hostages for a period exceeding eight months and its disdain of all diplomatic and international efforts to obtain their release. It is well settled in international law that where local remedies would be ineffective or meaningless or would not meet the international standard of minimum justice, the alien need not subject himself, in the first instance, to the local courts or administrative tribunals. *Interhandel Case (Switzerland v. United States)*, [1959] I.C.J. 6. *Restatement (Second) of the Foreign Relations Law of the United States* (1965) § 208.

(3) Plaintiffs can assert their rights to recover damages in this Court for violations of the Treaty and international law. First, the right of individuals and companies to enforce a private right of action in a United States court under the property protection provisions of a treaty of friendship, commerce, and navigation has consistently been upheld. *Asakura v. Seattle*, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); *Kolovrat v. Oregon*, 366 U.S. 187, 81 S.Ct.

922, 6 L.Ed.2d 218 (1961); *Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Hauenstein v. Lynham*, 100 U.S. 483, 25 L.Ed. 628 (1879). Second, since Article IV, paragraph 2 of the Treaty is self-executing, plaintiffs have a right of action before this Court. The Treaty clearly meets the criteria considered significant in determining whether a Treaty is self-executing and, therefore, capable of enforcement in a United States court. *People of Saipan v. United States Department of Interior*, 502 F.2d 90, 97 (9th Cir. 1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

(4) The Act of State Doctrine does not preclude this Court from awarding summary judgment in this case. First, the theory underlying the Act of State Doctrine is inapplicable in this litigation. The Court is not asked to judge the validity of defendants' expropriation of plaintiffs' interests in Iran, but rather defendants' failure, in violation of the Treaty and international law, to make adequate provision for the determination and payment of prompt, adequate, and effective compensation. Second, the Act of State Doctrine does not preclude judicial review where, as here, there is a relevant, unambiguous treaty setting forth agreed principles of international law applicable to the situation at hand. *Banco Nacional de Cuba v. Sabbatino, supra*. Third, the Act of State Doctrine does not apply since defendants' failure to compensate plaintiffs occurred in connection with a commercial activity of defendants. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

(5) The doctrine of sovereign immunity does not preclude this Court from awarding summary judgment in this case. First, on December 19, 1979, regarding plaintiffs' Motion for a Writ of Attachment, this Court decided that under the Treaty the defendants have waived any sovereign immunity. Hence, the law of the case doctrine dictates that this Court not reconsider that issue. Article XI, paragraph 4 of the Treaty eliminates sovereign immunity with

respect to defendants and their property. Second, even if the narrow view of the Treaty urged by the State Department in *Electronic Data Systems Corp. Iran v. Social Security Organization of the Government of Iran* (No. CA 3–79–218–F, N.D. Tex. June 21, 1979, *appeal pending*, No. 79–2641, 5th Cir.) is accepted, Article XI, paragraph 4 of the Treaty still waives sovereign immunity. Under the narrow interpretation, CII and its property are clearly subject to jurisdiction since CII is a commercial entity. Therefore, Iran which is inseparable from CII and of which CII is the alter ego with respect to the matters relevant here, is subject to the jurisdiction of this Court to the same extent as CII. Iran and its instrumentality (CII) are "in effect one person, one juridical person." *Electronic Data Systems Corp. Iran v. Social Security Organization of the Government of Iran*, No. 79 Civ. 1711 (S.D.N.Y. May 23, 1979), *remanded*, 610 F.2d 94 (2d Cir. 1979). *Accord, Banco Nacional de Cuba v. First National City Bank*, 478 F.2d 191 (2d Cir. 1973). Third, the defendants and their property do not enjoy any immunity pursuant to the terms of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* (1976). The third clause of Section 1605(a)(2) provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
>
> (2) in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Clearly, the failure of defendants to make provision of compensation to plaintiffs at the time of the taking of property has had a "direct effect" within the meaning of Section 1605(a)(2). *John J. McMullen Associates, Inc. v. Dubai Dry Dock Co.*, No. 78 Civ. 3924 (S.D.N.Y. Mar. 28, 1979). Further, the failure of defendants to provide compensation to plaintiffs, resulting in an increase of the State insurance monopoly from 25 or 50% to 100%, is an act "in connection with a commercial activity" within the meaning of Section 1605(a)(2). *United Euram Corp. v. U.S.S.R.*, 461 F.Supp. 609 (S.D.N.Y.1978).

Thus, plaintiffs are entitled to judgment as to defendants' liability on the allegations in Cause of Action One (Treaty violation) and Cause of Action Two (international law violation) of plaintiffs' amended complaint as a matter of law[2], and it is by this Court this 10th day of July, 1980, hereby,

ORDERED, that plaintiffs' Motion for Partial Summary Judgment be, and it hereby is, granted; and it is further,

ORDERED, that a hearing on the issue of damages will follow on a later date.

## PRELIMINARY INJUNCTION

Plaintiffs' Motion for a Preliminary Injunction having come on for hearing before this Court, and the Court having considered the Complaint, the Affidavits and the Memorandum of Points and Authorities submitted in support of that Motion, and the entire record herein and having heard oral argument thereon, and the Court having granted Summary Judgment for plaintiffs on the issue of liability, and it appearing that without the requested relief plaintiffs will sustain irreparable injury if certain conduct of defendants is not enjoined and restrained, it is hereby

ORDERED by the Court this 10th day of July, 1980 that the motion of the plaintiffs be and is hereby granted; and it is

FURTHER ORDERED that until such time as a determination of damages to plaintiffs in this action has been entered, defendant Islamic Republic of Iran and its political subdivisions, agencies and instrumentalities, and defendant Central Insurance of Iran (Bimeh Markazi Iran), and each of them, their successors or assigns, agents, employees and all other persons acting or attempting to act on their behalf or in concert with them who have actual notice hereof, by services or otherwise, are enjoined and restrained from transferring title to or possession of, withdrawing, or removing from the territory or the jurisdic-

---

**2.** This Court finds that there exist genuine issues of material fact regarding plaintiffs' Causes of Action Three (third party beneficiary), Four (conspiracy), and Five (conversion).

tion of the United States, or taking any steps to conceal any property now located in the United States, subject to the jurisdiction of the United States, or which is in the possession or control of persons subject to the jurisdiction of the United States, in which defendant Islamic Republic of Iran or any of its political subdivisions, agencies or instrumentalities, including defendant Central Insurance of Iran (Bimeh Markazi Iran), has any interest of any nature whatsoever, including cash, deposits, securities, or any other form of tangible or intangible personal property or real property, to the extent and in the amount necessary to satisfy plaintiffs' liquidated and unliquidated claims, attorneys fees, costs and interest, which are estimated to total approximately $35,000,000, above and beyond any such property as to which there are now, or before execution of final judgment in this case may be, any liens, attachments or previously established priorities; and it is

FURTHER ORDERED that plaintiffs shall give injunction security by posting a bond in the amount of $35,000,000 for the payment of such costs and damages as may be incurred by defendants if it is ultimately found that they were wrongfully enjoined or restrained.