591 F.Supp. 293 (1984)
McDONNELL DOUGLAS CORPORATION, Plaintiff,
v.
ISLAMIC REPUBLIC OF IRAN, Ministry of Defense of the Islamic Republic of Iran and Islamic Republic of Iran Air Force, Defendants.
No. 82-2096C(D).
United States District Court, E.D. Missouri, E.D.
June 29, 1984.
*294 Veryl L. Riddle, St. Louis, Mo., for plaintiff.
Joseph B. McGlynn, Jr., Belleville, Ill., Brian O'Dwyer, New York City, for defendants.

MEMORANDUM AND ORDER
WANGELIN, District Judge.
This matter is before the Court upon plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Court's jurisdiction is invoked pursuant to Title 28, United States Code, Section 1330.
Plaintiff, McDonnell Douglas Corporation, (hereinafter MDC) moves this Court to enter summary judgment in its declaratory judgment action against the Islamic Republic of Iran, the Ministry of Defense of the Islamic Republic of Iran, and the Islamic Republic of Iran Air Force (hereinafter collectively denominated as Iran). The thrust of MDC's complaint for a declaratory judgment is that it is not liable with respect to defendant's claims that it breached a contract to supply defendant with military aircraft parts. Also before the Court is defendant's motion to strike the affidavit of *295 one Lewis Johnson. Because of the interrelated arguments and considerations of the two motions, both are resolved herein.

FACTUAL HISTORY
On or about November 23, 1975, MDC entered into a contract with the Imperial Iranian Air Force (hereinafter IIAF) for the sale by MDC of spare parts for F-4 fighter aircraft. The contract, MCAIR-F4-75-001 (hereinafter the Basic Ordering Agreement), was for a one year period. It was subsequently renewed for three additional one-year periods in 1976, 1977, and 1978. It expired by its terms on November 23, 1979.
The Basic Ordering Agreement was intended to cover spare parts needed on an emergency basis for crash-damaged or grounded F-4 aircraft. In contrast to this, and also having some bearing on the present cause, was the government of Iran's separate contract with the United States government. This contract, referred to as a Foreign Military Sales Agreement, provided for the sale of routine spare parts and the repair of other parts ordered by the IIAF.
Payment under the Basic Ordering Agreement was made pursuant to an irrevocable letter of credit issued on behalf of the IIAF and payable at the First National Bank in St. Louis. The terms of the contract provided that payments under the letter of credit were to be made upon presentation of (1) an MDC invoice; (2) a collect air bill for the parts consigned to the freight forwarder specified in the contract; (3) a certificate of United States origin; and (4) detailed packing sheets establishing proof of delivery of the parts to the IIAF.
On November 22, 1978, the letter of credit expired. The IIAF failed to renew the letter and, consequently, the First National Bank in St. Louis refused to make payment on MDC invoices presented under the provisions of the Basic Ordering Agreement. Plaintiff alleges that it is still owed Five Hundred Thousand Dollars ($500,000) for work performed for the IIAF under the Agreement.
Because of the political turmoil that erupted in Iran in the latter part of 1978, MDC became concerned for the safety of its employees in Iran and subsequently ordered their evacuation. Moreover, the change of political regimes caused a number of IIAF officers to leave the country or resulted in their execution. As a consequence of the revolution, MDC alleges that it was unable to communicate with any responsible Iranian government official regarding the Basic Ordering Agreement.
On March 15, 1979, the United States Air Force ordered that no further Foreign Military Sales items be released for shipment. On March 26, 1979, the Air Force notified MDC that Behring International, Inc., the shipper designated by Iran in the Basic Ordering Agreement, had advised the Air Force that it would no longer honor collect inland transportation freight bills on behalf of the Iranian government. The United States Air Force then directed MDC not to ship any Iranian Foreign Military Sales items to Behring International, Inc. Thus, both the private Basic Ordering Agreement and the government to government Foreign Military Sales Agreement were effectively terminated at approximately the same time.
Following these events, MDC suspended all work in progress under the Basic Ordering Agreement. There were five pending orders at the time of the suspension.
On August 31, 1979, MDC sent a letter addressed to the "Commander of the Islamic Republic of Iran Air Force" notifying the Commander that all work on the five orders for spare parts or repair kits had been suspended by MDC, that the letter of credit had expired, and that the shipper refused to make shipments to Iran. MDC requested instructions on whether manufacturing should continue, for identification of a new shipper, and for reinstitution of the letter of credit. MDC received no response from its letter.
MDC alleges that, except for the five orders being processed at the time that the contract was cancelled, all of the remaining *296 orders were completed and fulfilled, including the orders which are the subject of the Iranian suit discussed infra. MDC further alleges that the five unfulfilled orders were not among the orders identified in the Iranian suit.
On December 5, 1979, all licenses for export of military aircraft parts to Iran were officially suspended by the Office of Munitions control. Prior to this suspension, however, on November 4, 1979, the Office of Munitions Control refused to grant or extend licenses for the export of military equipment to Iran. Therefore MDC avers that it was prohibited by the constrictions of the United States International Traffic in Arms Regulations, 22 C.F.R. Part 121 et seq., from exporting any F-4 parts to the Islamic Republic of Iran.

PROCEDURAL HISTORY
On approximately March 16, 1982, MDC received a copy of a notice from the Iranian Ministry of Justice claiming that the Islamic Republic of Iran Air Force had suffered damages as a result of the alleged breach by MDC of the Basic Ordering Agreement. MDC subsequently received a summons and a copy of a complaint (hereinafter the Islamic Complaint) from the Islamic Court of First Instance in Tehran, Iran on or about September 20, 1982. The Complaint specifically alleged that MDC had breached the Basic Ordering Agreement by failing to fulfil "approximately 40 orders" for parts submitted to plaintiff under the contract during the year 1977. Additionally, the Islamic Complaint alleged that "some parts" were sent to MDC for repair and/or exchange and that MDC had failed to perform as required under the contract.
The Islamic Complaint further alleged that the resulting absence of parts deprived the Islamic Republic of Iran Air Force of the use of its aircraft during the Iran-Iraq war. The complaint prayed for Six Million Dollars ($6,000,000.00) in damages, with the real amount of damages to be determined by an expert or group of experts. Defendants also demanded specific performance of the orders, return of the parts, and the payment of the costs, attorney's fees and the fees of the expert(s).
MDC subsequently filed this action seeking a declaratory judgment stating that:
(1) MDC has fully performed and satisfied all of the forty-three (43) orders identified in the Islamic Complaint as having been submitted to MDC under the Basic Ordering Agreement, except for four orders which were cancelled by the Imperial Iranian Air Force, and the work ordered under thirty-nine (39) orders have been accepted by and delivered to the Imperial Iranian Air Force, and MDC has no liability or obligation to defendants for any of the forty-three (43) orders.
(2) The parts identified in the Islamic Complaint as having been sent to plaintiff for repair and/or exchange under Article XII of the Basic Ordering Agreement were not in fact sent to MDC under that agreement, but, rather, were sent to MDC by the United States Government pursuant to a contract between the United States Air Force and MDC. MDC is not a party to the government-to-government Foreign Military Sales Agreement between the United States and Iran under which Iran contracted directly with the United States Government for such repair services and, thus, MDC has no obligation or liability to defendants.
(3) MDC has performed all of its obligations under the Basic Ordering Agreement; MDC is excused from performing any unfulfilled orders under the agreement; MDC's obligation under the agreement have terminated; and MDC has no remaining obligations or liability under the agreement to defendants.
(4) The Basic Ordering Agreement between MDC and defendants is subject to and governed by the laws of the United States and the State of Missouri, including the Uniform Commercial Code, and not the laws of the Islamic Republic of Iran.
(5) Any order, decree, decision or judgment entered by the courts of the Islamic Republic of Iran against MDC purporting to adjudicate rights and obligations under *297 the Basic Ordering Agreement is null, void, and unenforceable.
(6) The Basic Ordering Agreement provides that MDC is not liable for any consequential damages or for any other damages, loss, liability or claims for personal injuries, death and/or property damage arising or resulting from any negligent act of MDC or failure of MDC to act in performance of its obligations under the Basic Ordering Agreement.
(7) The damages sought by the Islamic Complaint submitted to the Court of First Instance of the Islamic Republic of Iran against MDC which are claimed to have been caused by the inability of defendants to fly aircraft in the war with Iraq for lack of spare parts are not recoverable either under the terms of the Basic Ordering Agreement or under the governing applicable law of the United States, and MDC is not liable for such damages.
(8) Any order, decree, decision or judgment entered by the Iranian courts against MDC purporting to award or grant other relief sought by the Islamic Complaint is null, void and unenforceable.

THE CONTRACT DISPUTE
In support of its motion for summary judgment, MDC has filed a substantial amount of documentary evidence indicating that the orders placed with MDC by defendant were either performed or excused from performance. Both Donald D. Chestnut, Manager of Financial Accounting for the McDonnell Aircraft Company (MCAIR), and William B. Eaton, the Assistant Manager Field Service of MCAIR, have provided affidavits asserting that of the forty-three (43) purchase orders submitted by the IIAF to MCAIR under the Basic Ordering Agreement, which defendant alleges in the Islamic Complaint were never performed, thirty-nine (39) were completed and fulfilled by MCAIR and the remaining four were cancelled by the IIAF. (Chestnut aff. p. 4; Eaton aff. p. 5).
Furthermore, Eaton stated that the second set of exhibits attached to the Islamic Complaint, which are purported to be a list of spare parts sent to MCAIR for repair and/or exchange pursuant to the warranty clause of the Basic Ordering Agreement, are in reality a list of spare parts returned to MCAIR pursuant to a "Repair of Repairables" contract between MDC and the United States Air Force. (Eaton aff. p. 6). Apparently no parts were ever returned for repair or replacement by the IIAF pursuant to the warranty provision of the Basic Ordering Agreement.
The Repair of Repairables contract was part of the Foreign Military Sales Agreement between the United States and Iran. As noted supra, under this agreement the United States agreed to arrange for the provision of repair services in connection with the operation of RF-4E reconnaissance aircraft that had been purchased by the IIAF from the United States Air Force. This contract was entirely distinct from the Basic Ordering Agreement between MDC and Iran.
Eaton's review of the MCAIR records and files indicated that of the twenty-six (26) items identified in the Islamic Complaint as not returned, twenty-five (25) of the items were repaired by MCAIR and delivered, either to the IIAF directly or to the United States Air Force, pursuant to the terms of the Repair of Repairables contract between MDC and the United States Air Force (Eaton aff. p. 7). The one remaining item listed on the exhibit to the Islamic Complaint was lost in transit (Eaton aff. Exhibit B).
Therefore, MDC contends, and this Court agrees, that (1) all contractual obligations under the Basic Ordering Agreement have been completed or otherwise fulfilled; (2) MDC owed no contractual obligation to Iran with regard to the parts returned under the Repair of Repairables contract; and (3) even if Iran did have a legally cognizable interest in MDC's repair of the parts returned to MCAIR pursuant to the Repair of Reparables contract, MDC has fully performed its obligations under the contract. This set of facts, MDC concludes, *298 warrants summary judgment in its favor.
With regard to other declarations requested in plaintiff's complaint, a brief recitation of the evidence and the law will prove adequate.

THE APPLICABLE LAW
First, plaintiff requests this Court to declare that the applicable law in adjudicating disputes under the Basic Ordering Agreement is the law of the United States and the State of Missouri. Article XVII of the Agreement states:
This entire agreement shall be subject to the laws of the United States and, particularly to the International Traffic in Arms Regulations, August 1969, issued by the Department of State, United States of America, governing the export and import of arms, ammunition and implements of war, including technical data related thereto.
Courts have held that this type of provision is a binding stipulation. See Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); American Institute of Marketing Systems, Inc. v. Brooks, 469 S.W.2d 932 (Mo.App.1971). This position has been codified in the Uniform Commercial Code. Section 1-105 of the Code states:
"Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement, this act applies to transactions bearing an appropriate relation to this state."
The contract was performed in Missouri: the furnished parts were fabricated or sold in Missouri; they were inspected in Missouri by MDC acting as an agent of Iran; they were delivered to defendants in Missouri and payments were made in Missouri under a letter of credit arrangement with the First National Bank in St. Louis. Thus, under the agreed upon laws of the United States, the applicable Uniform Commercial Code section indicates that Missouri law should be applied as the forum bearing "an appropriate relation" to the transaction. See Mo.Rev.Stat. § 400.1-105. Moreover, the U.C.C. constitutes the applicable federal law. Gardiner v. United States, 479 F.2d 39, 41 (9th Cir.1973).

EXCUSE FROM PERFORMANCE
Article XIII of the Basic Ordering Agreement states:
"MDC shall be excused from any failure to perform or delay in performing this agreement which arises out of causes beyond the control and without the fault or negligence of MDC. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the United States Government in either sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case failure to perform must be beyond the control or without the fault or negligence of MDC. MDC will inform the IIAF of such cases."
As previously noted, several events conspired to preclude MDC from legally or practically fulfilling its obligations under the terms of the Basic Ordering Agreement. First, the shipper designated in the Agreement, Behring International, Inc., refused further shipments to Iran beginning in January 1979. This refusal apparently was based on Behring's inability to communicate with responsible officials in Iran because of the political turmoil. See, e.g., Behring International, Inc. v. Imperial Iranian Air Force, 475 F.Supp. 383, 386 (D.N.J.1979). Attempts by MDC to communicate with the Iranian government to establish a new shipper were also unavailing. Thus, plaintiff was physically precluded from fulfilling the terms of the contract due to causes beyond its control.
Furthermore, MDC was legally precluded from executing the Basic Ordering Agreement. On November 14, 1979, the *299 Department of Treasury promulgated the Iranian Assets Control Regulations (31 C.F.R. 535) which blocked all property and interests in property of the government of Iran from being transferred to Iran. Specifically, Section 201(a) of the Iranian Assets Control Regulations states in pertinent part:
"No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which ... Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized."
See also National Airmotive v. Government and State of Iran, 499 F.Supp. 401 (D.C.Cir.1980). This regulation clearly relates to the parts being manufactured or repaired pursuant to the Basic Ordering Agreement.
Moreover, because the Basic Ordering Agreement related to the sale or export of military aircraft parts, an export license is necessary. See The International Security Assistance and Arms Export Control Act of 1976 as amended by the International Security Act of 1977 and the Security Assistance Act of 1979, 22 U.S.C. § 2751 et seq.; The Foreign Assistance Act of 1961, 22 U.S.C. § 2301 et seq.; and the International Traffic in Arms Regulations, 22 C.F.R. Part 121 et seq. The United States Department of State refused to issue any export licenses subsequent to November 4, 1979. MDC, therefore, could not legally export military aircraft parts that were the subject of the Basic Ordering Agreement.
Even absent the force majeure article of the contract, MDC would be excused from performance under the Basic Ordering Agreement because of legal or practical impossibility. This would be true under either Section 2-615[1] of the Uniform Commercial Code or the relevant case law. See, e.g. The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960 (1917); Eastern Airlines Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 992-98 (5th Cir. 1976).
Thus, MDC was unable to perform the contract as a practical matter because the political upheaval in Iran resulted in the refusal of Behring International, Inc. to transport the parts. This event was compounded by the governmental chaos which apparently left MDC unable to communicate with a responsible Iranian official in order to designate an alternative shipper. Moreover, MDC was unable to adhere to the terms of the contract because it was legally precluded from shipping the aircraft parts under both the Iranian Assets Control Regulations and the loss of its export license. This Court, therefore, finds no difficulty in declaring that MDC was excused from full performance of the Basic Ordering Agreement.

CONSEQUENTIAL DAMAGES
Article XIII of the Basic Ordering Agreement provides, in pertinent part:
"MDC warrants that all articles ordered under this agreement will be free from defects and workmanship and material at the time of delivery. MDC's liability thereunder will be limited to repair or replacement of defective articles returned to MDC within six (6) months following initial delivery and in no event will MDC be liable for consequential damages."
These types of agreements, limiting consequential damages, have been held enforceable by a number of courts. See, e.g. *300 Delta Airlines v. McDonnell Douglas Corp., 350 F.Supp. 738 (N.D.Ga.1972), aff'd., 503 F.2d 239 (5th Cir.1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); Tokio Marine & Fire Ins. v. McDonnell Douglas Corp., 617 F.2d 936 (2nd Cir.1980); S.M. Wilson and Co. v. Smith Int'l., Inc., 587 F.2d 1363 (9th Cir. 1978).
As plaintiffs point out, even without the provision of the Basic Ordering Agreement, consequential damages resulting from the loss of use of military aircraft in a war would be too speculative to be cognizable. Damages must not be remote or speculative but must instead be proved within a reasonable degree of certainty. See Agricultural Services Assoc., Inc. v. Ferry-Morse Seed Co., Inc., 551 F.2d 1057, 1072 (6th Cir.1977); Classic Bowl, Inc. v. AMF Pinspotters, Inc., 403 F.2d 463, 467 (7th Cir.1968).
Defendants present minimal opposition to plaintiff's case on the merits concerning the contract dispute. The documentary evidence opposing the motion for summary judgment consists exclusively of a telex communication from the Minister of Defense for the Islamic Republic of Iran disputing plaintiff's allegations in a series of conclusory statements.[2] No affidavits have been submitted to oppose those submitted by MDC. Moreover, many of the requests for documentary evidence made by defendants in their telex have, in fact, been provided by MDC. As previously delineated, plaintiff has provided documentary evidence accounting for all orders placed under either the Repair of Repairables contract or the Basic Ordering Agreement. Defendants response has not seriously disputed this evidence.
Rule 56(e) of the Federal Rules of Civil Procedure states in pertinent part:
"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."
The evidence overwhelmingly indicates that plaintiff fulfilled its obligations under both the Basic Ordering Agreement and *301 the Repair of Repairables contract or that performance of those obligations was waived or excused. Defendant has utterly failed to provide either evidence or arguments to the contrary. Therefore, this Court finds summary judgment on the merits of the contract dispute appropriate and fully warranted in favor of plaintiff.

THE FORUM SELECTION CLAUSE
Defendant's primary defense to plaintiff's motion for summary judgment focuses on two issues. First, defendants contend that this Court is deprived of jurisdiction in this cause by the operation of a valid forum selection clause contained in the Basic Ordering Agreement. Second, defendants argue that there exist unresolved questions of fact which preclude entry of summary judgment.
Article XV of the Basic Ordering Agreement is the forum selection clause. It provides:
"Article XV  Negotiation  Any difference or dispute from the execution of the contract that may not be settled amicably should be settled through the Iranian Courts."
Defendants contend that this clause was included by the contracting parties to ensure that any litigation under the agreement would be conducted in Iran. Therefore, defendants conclude, this Court is deprived of jurisdiction in this matter.
Defendants rely upon two United States Supreme Court cases as authority for this argument. In The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Court held that a forum selection clause should be considered "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be `unreasonable' under the circumstances." Id. at 10, 92 S.Ct. at 1913. The clause at issue provided: "Any dispute arising must be treated before the London Court of Justice." The Court noted that there are "compelling reasons" why a freely negotiated private international agreement should be given full effect. Id. at 12-13, 92 S.Ct. at 1914-1915. Specifically the Court noted that the subject transaction, towing a drilling rig from Louisiana to a point off the Italian coast, necessarily involved passing through a number of different jurisdictions. Therefore, the forum selection clause was a necessary and vital portion of the agreement that aided in establishing the parameters and the cost of litigation.
Another consideration was the nationality and expertise of the courts of the selected forum. "Plainly, the courts of England meet the standards of neutrality and long experience in admiralty litigation. The choice of forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason, it should be honored by the parties and enforced by the courts." Id. at 12, 92 S.Ct. at 1914.
The court indicated three reasons why a forum selection clause may not be enforced. First, the court noted that an enforceable forum selection clause, as with any contract, must be freely negotiated, "unaffected by fraud, undue influence, or overweening bargaining power." Id. at 12, 92 S.Ct. at 1914. Second, if enforcement of the forum selection clause would contravene a strong public policy of the forum in which the suit is brought, the clause should not be enforced. Id. at 15, 92 S.Ct. at 1916. See also, Boyd v. Grand Truck W.R. Co., 338 U.S. 263, 70 S.Ct. 26, 94 L.Ed. 55 (1949). Finally, even though the clause was freely negotiated and contravenes no important public policy of the forum, it may still be unenforceable if the selected forum is "seriously inconvenient" for the trial of the action. The court cautioned, however, that "where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable." Id. 407 U.S. at 16, 92 S.Ct. at 1916.
*302 The court concluded that the selection of London as the trial forum was "clearly a reasonable effort" to provide certainty to the transaction and "to provide a neutral forum experienced and capable in the resolution of admiralty litigation." Id. at 17, 92 S.Ct. at 1917. The court further concluded that the evidence presented was insufficient to overcome the presumptive validity of the forum selection clause and, therefore, ruled that the clause must be enforced. See also Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), reh. denied, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129.

A. The Validity of the Forum Selection Clause.

In its attempt to nullify the effect of the forum selection clause, MDC does not argue that the contract, at the time of its inception, was the product of unequal bargaining power. Therefore, the issues of fraud, overreaching or undue influence are absent from this controversy. Nor does plaintiff contend that the clause contravenes any public policy of the Islamic Republic of Iran. Instead, MDC attacks the forum selection clause from two directions. First it argues that there is no actual, enforceable forum selection clause when the conventional rules of contract construction are applied. Second, plaintiff argues that even if a valid forum selection clause exists, it should not be enforced because the indicated forum, Iran, has become unforseeably and seriously inconvenient.
MDC's first argument focuses on the language of the clause. MDC points out that the language of the forum selection clause is merely preferential i.e. "should be settled" and not obligatory. This contrasts with the language employed in the forum selection clauses which were at issue in the cases defendants cite as authority. In The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1973), the forum selection clause stated, as noted, supra, "Any dispute arising must be treated before the London Court of Justice" (emphasis added). In Scherk v. Alberto-Culver Co., 417 U.S. 506, 508-09 n. 1, 94 S.Ct. 2449, 2451-2452 n. 1, 41 L.Ed.2d 270 (1974), the subject clause provided: "The parties agree that if any controversery or claim shall arise out of this agreement or the breach thereof and either party shall request that the matter shall be settled by arbitration, the matter shall be settled exclusively by arbitration.... All arbitration proceedings shall be held in Paris, France...." (emphasis added). Finally, in Gaskin v. Strumm Handel gmbh, 390 F.Supp. 361, 363 (S.D.N.Y.1975), also cited as authority by defendants, the forum selection clause stated: "In case of failure of such negotiations, it is agreed that Essen (the Republic of Germany) shall be the forum to which any controversy must be settled." (emphasis added).[3]
Plaintiff notes that the forum selection clause in the Basic Ordering Agreement lacks this mandatory or obligatory language and, therefore, may be distinguished from the cases cited by defendants.
This Court agrees that the use of the word "should" within the context of the Basic Ordering Agreement cannot be considered *303 binding on the parties. Instead, it must be considered as expressing only a preference between the two available fora. See, e.g., Canal National Bank v. United States, 258 F.Supp. 626 (S.D.Me.1966); Seifner v. Weller, 171 S.W.2d 617 (Mo.1943). Therefore, while the forum selection clause must be given some weight in the determination of the issues presented, it need not be considered as presumptively binding as the clause at issue in The Bremen.

B. The Enforceability of the Forum Selection Clause.

With this factor in mind, the Court now turns to the evidence submitted by plaintiff indicating that Iran would be an inappropriate forum to resolve this dispute. MDC contends that the Iranian legal system has undergone a radical transformation in recent years. Specifically, MDC asserts that there has been a wholesale renunciation of the principles of Western jurisprudence in favor of Islamic legal precepts; that Iran has replaced experienced secular judges with theological students; that Iranian attorneys are unwilling to accept United States clients because of fear of persecution; and that the Iranian government has sponsored anti-American campaigns. These alleged conditions lead plaintiff to conclude that the current Iranian legal system is inadequate for, and ill disposed to, fairly adjudicate the contractual dispute between the parties. Thus, the forum selection clause should not be enforced.

THE JOHNSON AFFIDAVIT
To support these assertions, plaintiff presents this Court with the affidavit of one Lewis Johnson. Mr. Johnson, a 1949 graduate of the University of Louisville Law School and a member of the Kentucky State Bar, resided in Iran from February of 1960 until November 9, 1979. He was a principal and a partner in the firm of John A. Westberg & Associates, Inc. in Tehran from 1973 until 1979. This firm rendered professional legal services dealing with transnational contracts, the organization and registration of Iranian companies, the registration of branch offices of foreign companies, assistance in the negotiation of various contracts with Iranian government agencies and private companies, joint venture arrangements and licensing agreements, and assistance on Iranian tax, social security, labor, and other matters of concern to American and Iranian clients. Moreover, Johnson was accepted as a provisional attorney by the Tehran Bar Association and has been acquainted with a large number of Iranian attorneys and judges both prior to and since the Islamic Revolution of 1979. Since the end of 1979, Mr. Johnson attests that he has worked in Washington, D.C. as a consultant on Iranian and international law matters and has maintained regular contact with individuals who have visited Iran or who have emigrated from Iran since 1979.
Johnson's opinion of the fairness of the Iranian legal system is bleak:
"No U.S. national, including companies owned and controlled by U.S. nationals, can under present conditions expect to obtain adequate, competent and independent legal representation before an Iranian court in an action brought ... against the Government of the Islamic Republic of Iran or any of its ministries, agencies, instrumentalities or other controlled entities ... and ... no such U.S. national can under present conditions expect to receive a fair, impartial and just hearing of any such case before an Iranian court."
Johnson arrives at this conclusion based on his knowledge of the Iranian legal system both before and after the Islamic Revolution. Prior to the Revolution, Johnson characterizes the legal system as a well-defined structure, complete with Courts of First Instance of specific and general jurisdiction, intermediate Courts of Appeal with broad jurisdiction to review all issues of law and fact and a Supreme Court with more limited jurisdiction to review judgments of the lower courts. Judges were provided with substantial independence. Furthermore, the basic legal codes of Iran, including the Civil Code, the Commercial *304 Code and the Civil Procedure Code of Iran were modeled upon the codes of Western Europe.
Soon after the Islamic revolution in 1979, however, Mr. Johnson describes a radical change in the legal system. On March 8, 1979, the Law for the Amendment of the Organization of the Ministry of Justice and the Law on Employment of Judges was enacted. This law provided broad, temporary authority to dismiss judicial personnel, including judges, to restructure the Ministry of Justice and to assist the Ministry of Justice in recruiting Islamic legal experts for the new judicial system. On March 16, 1979, the Supreme Court was dissolved along with the Prosecutorial Office and the Disciplinary Review Courts.
A revised constitution, the Constitution of the Islamic Republic of Iran, was completed in November of 1979 and ratified by popular referendum in December of 1979. Article IV of this constitution provides:
"All civil, criminal, financial, economic, administrative, cultural, military, political, and other laws and regulations must be based on Islamic standards. This principle governs the application or the generality of all principles of the constitution, and other regulations. Decisions in this matter are the responsibility of the religious jurists of the Council of Guardians."
Johnson affidavit, Exh. 1.
Johnson points out that a significant feature of the prior legal system was its relative stability and uniformity. However, the abolition of the intermediate Courts of Appeals, which had adjudicated all appeals on the merits, resulted in a severe restriction of judicial review of lower court rulings. "In civil case, the Supreme Court now hears only appeals involving the jurisdiction of the Court of First Instance, a judgment contrary to law, a gross violation of prescribed procedure, or contradictory judgments in the same matter issued by different trial courts." Johnson affidavit, p. 7; Civil Procedure Code of Iran Art. 559. Thus, there are relatively few grounds for appeal under the current legal system and, consequently, an incorrect adjudication on the merits has only a limited possibility of being disturbed.[4]
The possibility that a Court of First Instance will resolve a trial on the merits incorrectly has been exacerbated by the change in judicial personnel. The High Judicial Council, a body of Islamic jurists, has dismissed fifty percent (50%) of the judiciary and arranged for the gradual replacement of the remainder within four years. Johnson aff., exhibits 3 and 4. The new Judicial personnel is composed of seminary students trained in Shiite legal traditions. These legal traditions differ radically from Western traditions. See Plaintiff's Motion for Summary Judgment, Exh. B-3.
Johnson further states that a fundamental change in the Iranian legal system has occurred because of the severe disruption of the Tehran Bar Association. Attorneys reportedly have been executed, flogged, arrested and forced to flee for defending political enemies of the Islamic Republic of Iran. See Johnson aff., p. 9-11; Exhs. 7 and 8. From this evidence, Johnson concludes that no Iranian attorney would be free to conduct an independent representation of a United States company in litigation in Iran against the Iranian government or any of its subdivisions.
Finally, Johnson alleges that government-sponsored anti-Americanism precludes a fair trial for plaintiff in Iran. Mr. Johnson indicates that anti-American attitudes are encouraged in Iran and reflect official policy. He supports this assertion by pointing out speeches made by Ayatollah Khomeini, which designate the United States as "the Great Satan" and the "mother of corruption"; derogatory statements about the United States made by other Iranian leaders; and the Preamble to the *305 1979 Constitution of the Islamic Republic of Iran "which characterize the Shah's White Revolution as an `American Plot' and make it evident that the Islamic Republic is founded on hostility to the United States and the `foreign' culture it represents." Johnson aff., p. 13.
This atmosphere severely inhibits members of the Iranian business and professional communities in their dealings with American companies or firms. The delineation of the United States as an enemy of the Islamic Republic of Iran has dissuaded Iranian attorneys from performing work or rendering legal services to United States clients. These attorneys apparently fear an accusation that they are enemies of the state.
Johnson concludes that there are fundamental and radical distinctions between the present legal system in Iran and the system established at the time that the parties entered into the contract. He further concludes that the policies of the Iranian government and the atmosphere these policies have engendered is so inimical to the interest of United States nationals and companies that they cannot receive a fair trial in Iran.
Mr. Johnson's affidavit and the affixed documentary evidence provide the bulk of plaintiff's case that the Iranian legal system has experienced changes so extensive that the preferential forum selection clause should not be enforced. Plaintiff also requests, however, that this Court direct its attention to prior cases wherein courts have taken judicial notice of the recent unstable political climate in Iran. See Behring International, Inc. v. Imperial Iranian Air Force, 475 F.Supp. 383 (D.N.J. 1979), aff'd, 699 F.2d 657 (3rd Cir.1983); American International Group v. Islamic Republic of Iran, 493 F.Supp. 522, 525 (D.D.C.1980); Itek Corp. v. First National Bank of Boston, 511 F.Supp. 1341 (D.Mass. 1981), vacated on other grds., 704 F.2d 1 (1st Cir.1983).

DEFENDANTS' RESPONSE
Defendants respond to plaintiff's argument first by contending that the dispute between the parties concerning the proper construction of the forum selection clause raises a genuine issue of fact which cannot properly be resolved in a motion for summary judgment. Second, defendants directly attack the Johnson affidavit. Defendants have moved to strike Johnson's affidavit on a number of grounds and reiterate this request in their pleading styled "Sur-reply to Plaintiff's Motion for Summary Judgment." Finally, defendants argue that judicial notice that plaintiff would not receive a fair trial in Iran is inappropriate.
With regard to its first contention, defendants argue that granting summary judgment is inappropriate when the intent of the contracting parties is unclear. See Heyman v. Commerce and Industry Insurance Co., 524 F.2d 1317, 1320 (2nd Cir. 1975); Davis v. Chevy Chase Financial Ltd., 667 F.2d 160 (D.C.Cir.1981). Defendants contend that such a dispute raises a genuine issue of material fact concerning the interpretation of the contract, thereby precluding a grant of summary judgment. Moreover, defendant would raise this argument in conjunction with the well-established rule that the facts and record must be viewed in the light most favorable to the party opposing a motion for summary judgment. Fed.R.Civ.Pro. 56(c); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Read in this light, defendants conclude that the word "should" in the forum selection clause must be accorded an interpretation consistent with defendant's position that the clause is mandatory.
This Court cannot agree that summary judgment is inappropriate whenever two parties disagree concerning the construction of a contract. As the court pointed out in Universal Fiberglass Corp. v. United States, 400 F.2d 926 (8th Cir.1968), if this argument were adopted, "summary judgment could never be granted in contract actions because arguably some term in every contract is subject to interpretation." Id. at 928-29. See also Union Planters National Leasing Co. v. Woods, *306 687 F.2d 117 (5th Cir.), rehearing denied, 691 F.2d 502 (1982). The bare assertion by one party, as here, that it disagrees with the interpretation accorded the contract by the other party will not be allowed to vitiate so proper and useful a tool as summary judgment.
Furthermore, this Court cannot agree that the wording of the forum selection clause raises a genuine issue of material fact. The forum selection clause clearly expresses a mere preference that disputes arising from the contract be settled in Iranian courts. Defendants are quite correct that the evidence must be viewed in the light most favorable to the party opposing summary judgment. However, that party must be accorded only the reasonable inferences that arise from the evidence presented. Defendants would have this Court read a preferential forum selection clause as mandatory. This Court cannot grant defendants so deferential an interpretation.
Defendants directly attack the Johnson affidavit on a number of grounds. First, defendants argue that the Johnson affidavit is inappropriate evidence under Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) provides, in pertinent part:
"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissable in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."
Defendant argues that because Johnson does not state that his affidavit is based on personal knowledge it is inadmissable as evidence unless it comes under an exception to the personal-knowledge rule.
Defendants acknowledge that an affidavit need not be based on personal knowledge if the affiant qualifies as an expert witness. Rule 703 of the Federal Rules of Evidence states:
"The facts or data in the particular case upon which an expert bases an opinion or inference may be perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissable in evidence."
Defendants contend, however, that Johnson is not qualified as an expert witness under Federal Rule of Evidence 702. Furthermore defendants assert that, "Even if Mr. Johnson could be qualified as an expert on Iranian law prior to November 7, 1979, the fact that he has never appeared in an Iranian Court after that date would disqualify him as an expert on the present legal system."
Johnson lived in Iran and was actively involved with the legal community there. Rule 702 of the Federal Rules of Evidence provides in part: "... a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." (emphasis supplied). Regardless of any possible lack of other credentials, the Court finds that Johnson's nineteen (19) years in the Iranian legal community certainly provide him with sufficient experience to be considered an expert of the past Iranian legal system. Furthermore, Johnson's constant communication with individuals who have personal knowledge of the current conditions in Iran as well as his study of Iranian periodicals indicate that he has sufficient knowledge of the present legal system to render an expert opinion on this aspect of the case as well.[5]
*307 Defendants also assert that the facts relied upon by Mr. Johnson in arriving at his conclusions were not those "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Defendants specifically attack Johnson's reliance on the International Iran Times, asserting that it is a partisan newspaper which is loyal to the former royal family. Defendants also attack Johnson's reliance on secondary source material.
The Court must reject defendants' refutation of the Johnson affidavit. Defendants offer no evidence supporting their contention that the International Iran Times is partisan nor do defendants state specifically why Johnson's use of secondary source material is necessarily deficient. Moreover, Johnson's personal contacts with individuals who have visited Iran or have come from Iran since the revolution remains unchallenged. Finally, the Court notes that it has accepted Mr. Johnson as an expert not on Iranian law, but on the status of the Iranian legal system. This is not a matter of subtle variation or dispute. By its very nature, the type of internal disruption of the judicial system which engenders the radical changes alleged by plaintiff is broad-based and obvious and therefore easily susceptible to evaluation.
Johnson's source material is apparently the best possible under current circumstances. Both Johnson's affidavit and recent American experience in Iran indicate that travel there is potentially hazardous. In fact, in January of 1981, the United States State Department issued a Travel Advisory warning that travel to Iran is "extremely hazardous" because of the "virulent anti-American stance of the Iranian government." It is difficult, therefore, to understand how personal knowledge concerning the current status of the Iranian legal system may be obtained. Although defendants criticize Johnson's use of secondary sources, they do not argue that this is not the best information available. Therefore, although some of Mr. Johnson's source material is not of the type traditionally relied upon by experts in the field, this Court finds that it is the type an expert would rely upon under these unusual circumstances. The Court finds that it is sufficient evidence to be reasonably relied upon.
Defendant has submitted the affidavit of Dr. Hamid Varasteh as documentary evidence in opposition to the affidavit of Mr. Johnson. Dr. Varasteh's affidavit essentially contradicts the general conclusions of the Johnson affidavit in every respect. Submitted in addition to the affidavit evidence are English translations of two judgments in Iranian courts in favor of American companies in default judgment hearings. The totality of this evidence purports to indicate that plaintiff can expect a fair trial in Iran.
The Varasteh affidavit fails to raise a genuine issue of material fact for several reasons. First, it attempts to refute much of Johnson's documentary evidence "on information and belief that it [the International Times of Iran] is a propaganda weapon of officials and former officials of the Shah's regime." Varasteh aff., paragraph 4. Statements made on information and belief will not adequately oppose a motion for summary judgment. See, Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Bumgarner v. Joe Brown Co., 376 F.2d 749 (10th Cir.1967).
The other averments in the Varasteh affidavit are equally weak and ineffectual. They consist primarily of conclusory statements regarding the conceptual fairness of the legal system of the Islamic Republic of Iran. Specific refutation of the allegations of the Johnson affidavit are rare and unsupported by any documentary evidence.
This Court must distinguish the substance of the two opposing affidavits. The Johnson affidavit seeks to establish and, in this Court's view, does establish that the Islamic revolution and the subsequent rise to power of clerics in Iran has so thoroughly affected the legal system that enforcement of a preferential forum selection clause would be unreasonable. In the course of his affidavit, Mr. Johnson refers *308 to specific and actual instances where the Iranian legal system has violated traditional concepts of fairness and sound judicial policies. He contrasts these practices with the prior, stable legal system that existed under the former Shah's regime. It is the actual distinctions between the two systems that counsels this Court to void the preferential forum selection clause.
Defendants seek to refute Johnson's affidavit by relying on an affidavit that speaks to the conceptual fairness of the Iranian legal system but fails to join the issue with respect to the specific instances delineated by Johnson. This results in an ineffective refutation of the Johnson affidavit. The issue before the Court is not the goals of the Iranian legal system but rather its actual deterioration. The Varasteh affidavit simply fails to address this issue.
Other evidence submitted by defendants is even less availing. Copies of two judgments by Iranian courts that refused to register default judgments against American defendants is insufficient to refute plaintiff's evidence of changes in the legal system. Moreover, the ratio decidendi of the judgments is too uncertain to make any valid extrapolation for the entire judicial system.
In what appears to be a final argument to enforce the preferential forum selection clause, defendants argue that an examination of the regime of the former Shah reveals a record of human rights violations so extensive that plaintiff is estopped from claiming that circumstances have changed radically. In effect, defendants appear to assert the startling argument that the current Iranian judicial system is no worse than the "corrupt" former judicial system. Defendants attempt to substantiate this claim by submitting the testimony of a member of Amnesty International to the Subcommittee on International Organizations of the Committee on International Relations of the House of Representatives. Again, however, defendants fail to grasp the essential issue. The substance of this testimony dealt only with the Courts of Military Justice. It did not examine the basic precepts or procedures of the civilian courts that would presumably adjudicate this matter. Therefore, this evidence is irrelevant to the present cause even if it were totally true and admissible in its entirety.

CONCLUSION
Plaintiffs have shown conclusively that there is no genuine issue of material fact with regard to the merits of this action. The affidavits and documentary evidence establish that plaintiff has performed, or is excused from performing, all of its obligations under the contract. With respect to whether the Article XV of the contract divests this Court of properly exercising jurisdiction, the Court concludes that it does not. First, the Court has found that as a matter of law Article XV is clearly not a mandatory forum selection clause but instead states merely a forum preference. Second, the Court has found that even if the clause were considered mandatory, it would not be enforceable because of changed circumstances in the forum state.
Defendants have failed to establish a genuine issue of material fact to rebut plaintiff's evidence. Summary judgment in favor of plaintiff is proper and will be so entered.
NOTES
[1] Uniform Commercial Code § 2-615 states, in pertinent part:

"Except a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be valid."
[2] The telex statement in its entirety asserts the following:

"Return TLX No. 59/83 of Sept. 19, 1983. The information concerning the subject in question is as follows. Please advise us of the outcome of the actions immediately.
1. Col. Sadighi was the agent of the Air Force in the U.S. Purchase Center.
2. Neither Col. Sadighi nor the Air Force took delivery of the 39 parts ordered by the Air Force. If McDonnell Douglas Corp. claims their delivery to the Iranian agencies in the U.S., they should demonstrate substantiating documents specifying the date and the name of persons who have taken delivery of the said parts.
3. The renewal of the letter of credit claimed by M.D.C. is groundless, as the said letter of credit with the balance of U.S.D. 1227481 was valid until November 22, 1978. At the same time the Iranian Air Force has not yet been informed of the specifications of the four outstanding orders.
4. The Iranian Air Force returned 259 defective parts to M.D.C. for repair, but has not yet received them. If M.D.C. claims there has been a separate contract between the Iranian and the U.S. Air Forces for the repair of the said parts and by virtue of this contract has proceeded with the repair and delivery of the said parts to the U.S. government then they should present documents indicative of their delivery.
5. In our opinion, to contest the jurisdiction of U.S. court over the claims brought by M.D.C. is of great importance, and as it has already by Article 15 of the contract entered into between the then Iranian Air Force and M.D.C. been (p)rovided, the Iranian Court is the competent forum to decide upon any dispute arising from the contract. Even if such stipulation had not been provided in the contract still the Iranian court would have been the competent forum, because the institution of (the) law suit in the court of respondent's country (Iran) is the logical rule in relation to the jurisdiction which is accepted all over the world. In addition to the above said two inevitable rules, the provisions of the Algiers accord is indicative of the non-jurisdiction of U.S. court.
Rgds.
For Minister of Defense the Islamic Republic of Iran Col. Afrakhteh."
[3] The prerequisite of mandatory language for an enforcement of a forum selection clause was the position of the United States government before the Iran-United States Claims Tribunal. See Memorial of the United States of America on the Issue of Jurisdiction, 8-15, June 1, 1982). (Plaintiff's Motion for Summary Judgment, Exhibit B.1). Interestingly, the Declaration of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of America and the Government of the Islamic Republic of Iran of January 19, 1981 (the "Claims Settlement Agreement") provides an "exception clause" to the Claims Tribunal's jurisdiction that is pertinent to the language of the forum selection clause at issue. Article II, paragraph I of the Claims Settlement Agreement generally confers jurisdiction on the Claims Tribunal Except for "claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts in response to the Majlis position." (emphasis supplied.) From the language of this paragraph it appears that the current Iranian government has impliedly agreed, in at least one document of significant importance to dispute resolution, of the type at issue here, that a forum selection clause must be both specific and exclusive to be enforceable.
[4] This condition apparently has expanded. In a letter dated August 19, 1983, filed as a supplement to his original affidavit, Johnson reports that the High Judicial Council has ordered the dissolution of all courts of appeal including peace, civil, special civil, and independent peace courts.
[5] Defendants contend that Mr. Johnson's lack of courtroom experience in Iran since November 7, 1979, disqualifies him as an expert on the present legal system. This raises two points of interest. First, the Court notes that courtroom experience is hardly the only criterion by which an individual's knowledge of the legal system may be measured. Second, the Court finds it odd that defendant should argue that Mr. Johnson's lack of recent experience in Iran should disqualify him to testify about the present legal system. This argument undercuts defendant's position that the Iranian legal system has not changed since the revolution and supports plaintiff's assertion that fundamental changes have occurred.